No. 25-7438

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

JOHN DOE,

*Plaintiff-Appellant*,

v.

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al.

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-02930-RFL
Hon. Judge Rita F. Lin

---

PRELIMINARY INJUNCTION APPEAL
APPELLANT'S OPENING BRIEF

---

*Rhonda Lunsford, Esq.*
*P.O. Box 31*
*San Leandro, CA 94577*
*(510) 759-9529*
*Attorney for Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ....................................................................1

JURISDICTIONAL STATEMENT .......................................................5

STATUTORY [AND REGULATORY] AUTHORITIES......................................6

ISSUE(S) PRESENTED ...............................................................6

STATEMENT OF THE CASE........................................................8

SUMMARY OF THE ARGUMENT ....................................................17

STANDARD OF REVIEW ..........................................................22

ARGUMENT ....................................................................24

  A. The District Court Abused Its Discretion by Applying the Wrong Standard for Preliminary Injunctive Relief……………………………………..24

  B. Appellant Raised Serious Questions Going to the Merits Based on Multiple Independent Federal Violations...………………………………….26

    1. The Regents of the University of California Are the Proper Defendant and Real Party in Interest……………………………………26

    2. The Regents Discharged Appellant While a QIO Reconsideration Was Pending, Raising Serious Questions Under 42 C.F.R. § 405.1204

    3. The Regents Failed to Ensure a Safe and Appropriate Discharge in Violation of 42 C.F.R. § 482.43……………………………………..29

    4. The Regents' Failure to Implement the QIO Reconsideration Determination Raises Serious Questions of Federal Compliance…..30

    5. The District Court Erred by Treating § 1983 Enforceability as Dispositive at the Emergency Stage……………………………32

    6. FEHBA Independently Authorizes Enforcement of OPM's Final Benefits Decision Against the Carrier……………………………34

ii

a) The Statutory Text Imposes a Mandatory, Non-Discretionary Duty on the Carrier……………………………………………….35

b) Section 8902(j) Imposes a Mandatory Federal Obligation Enforceable Through Equitable Relief………………………….36

c) FEHBA's Statutory Framework and OPM's Final Determination Establish Ongoing, Irreparable Harm From Continued Carrier Noncompliance…………………………………………………….37

C. The District Court Abused Its Discretion by Rejecting Irreparable Harm Despite Undisputed Evidence of Escalating Medical Danger…………….40

   1. Serious Threats to Health and Bodily Integrity Constitute Irreparable Harm as a Matter of Law……………………………………………41

   2. Coercion Through Deprivation Constitutes Independent Irreparable Harm……………………………………………………………...42

   3. Loss of the QIO appeal process constitutes deprivation of a federally guaranteed procedural protection and establishes irreparable harm as a matter of law……………………………………………………...44

   4. Stigmatizing Medical-Record Notations Create Ongoing and Irreparable Barriers to Care………………………………...….44

     a. Failure to Properly Apply the Winter Factors and Rule 65(b)..…45

     b. Identification of Stigmatizing Record Categories Is Sufficient at the Emergency Stage……………………………………………45

     c. Preserving the Status Quo Requires Halting Ongoing Dissemination of Harmful Information……………………….47

     d. Causation at the Preliminary Injunction Stage Requires Probability, Not Proof………………………………………………….48

D. The District Court's Error Warrants Reversal…………………………….49

E. The District Court Erred by Denying Interim Relief Without Analyzing Appellant's ADA, Section 504, and ACA § 1557 Claims………………..51

F. The Balance of Equities and the Public Interest Tip Sharply in Appellant's Favor………………………………………………………………………53

G. Relief Is Warranted Under the Ninth Circuit's Sliding-Scale Standard…..55

CONCLUSION .......................................................................................56

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Alexander v. Choate*, 469 U.S. 287, 301 (1985) .............................52

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, (9th Cir. 2011) ....................................................................... 4, 18, 23, 25, 26, 55

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1063 (9th Cir. 2014) .....................................................................................................23

*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191–93 (2023) ...........44

*Bell v. Hood*, 327 U.S. 678, 682–83 (1946)......................................34

*Bowen v. Massachusetts*, 487 U.S. 879, 893–900 (1988)................36

*California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).......................24, 52

*Carey v. Piphus*, 435 U.S. 247, 266–67 (1978) ................................44

*Cuviello v. City of Vallejo*, 944 F.3d 816, 833–34 (9th Cir. 2019) ...28, 51
*Doe v. Kelly*, 878 F.3d 710, 719-722 (9th Cir. 2017).......................4, 20, .....................................................................................................43, 54

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) .......................................44

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). 22, 47

*Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004) ......22

*Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 177–80 (2023) .................................................................................4, 34

*Hernandez v. Sessions*, 872 F.3d 976, 994-995 (9th Cir. 2017) ...4, 19, 41, 44, 48, 54

*Leiva-Perez v. Holder*, 640 F.3d 962, 968-70 (9th Cir. 2011)...........4, 19.. ...............................................................................25, 26, 45, 55

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) ...................................................................................25

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002) ...................................................................................26, 51

*Save Our Valley v. Sound Transit*, 335 F.3d 932 (9th Cir. 2003) ....34

*Sierra Club v. Trump*, 929 F.3d 670, 704 (9th Cir. 2019).................25

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). ...............................................................................23, 44, 45

## Statutes

5 U.S.C § 8901 et. Seq..................................................................5, 14, ...............................................................15, 21, 35, 37, 38, 39, 40, 54

5 U.S.C. § 8902(j)........................................................................35, 36, ...............................................................................................37, 40

28 U.S.C. § 1292(a)(1) ......................................................................6

28 U.S.C. § 1331 ...............................................................................5

42 U.S.C. § 1395ff(c).......................................................................5, 44

42 U.S.C. § 1983..............................................................................5, 20, ...............................................................................26, 32, 33, 34, 36, 52

42 U.S.C. §18116..............................................................................2, 5, ...............................................................................7, 21, 51, 52, 53, 57

v

## Regulations

42 C.F.R. §§ 405.1200–405.1206.....................................................44

42 C.F.R. § 405.1204...................................................................7, 28

2 C.F.R. § 482.43.....................................................................7, 29,30

## Rules

Fed. R. Civ. P. 17(a)......................................................................27

Fed. R. Civ. P. 65(b)..............................................................44, 45, 47

## California Constitution

Cal. Const. art. IX, § 9(a), (f).........................................................27

## Other Authorities

Michael G. Sun et al., *Negative Patient Descriptors: Documenting Racial Bias in the Electronic Health Record*, 41 Health Affs. 203 (2022) ...49

Anna Goddu et al., *Do Words Matter? Stigmatizing Language and the Transmission of Bias in the Medical Record*, 33 J. Gen. Internal Med. 685 (2018) ........................................................................................49

## INTRODUCTION

This appeal challenges the denial of emergency injunctive relief in the face of an ongoing medical crisis. Appellant John Doe is a medically fragile, immunocompromised federal employee whose survival depends on continuous skilled nursing care, implanted port-based infusions, physician oversight, aggressive rehabilitative therapy, and placement in a medically appropriate facility. Interruption of that care exposes him to immediate risk of serious injury or death.

The district court acknowledged that Appellant's medical situation is "undeniably serious" and that the allegations surrounding his discharge are "quite troubling," particularly in light of the federal Quality Improvement Organization's ("QIO") determination that continued hospital services were required and that a safe discharge location had not been secured. Nevertheless, the court denied emergency relief, not because the danger was disputed, instead stating that, "…he has failed to demonstrate (a) a likelihood of success, or at least a serious question, as to the merits of his claims concerning the discharge at issue, or (b) that he will suffer immediate, irreparable

harm in the absence of preliminary relief concerning the notations in his file."

In denying relief, the court erred by concluding that no serious question was presented regarding the authority and responsibility to enforce binding administrative decisions, such as those issued by Livanta QIO and the U.S. Office of Personnel Management ("OPM"), despite undisputed evidence that failure to enforce those determinations results in irreparable harm by depriving Appellant of access to medically necessary care.

Moreover, the court's order rests in part on legal conclusions that foreclosed consideration of Appellant's independent claims under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), and Section 1557 of the Affordable Care Act ("ACA"). These statutory frameworks provide express private rights of action for disability discrimination and establish that unequal treatment constitutes irreparable injury regardless of downstream consequences. The district court's failure to address these claims warrants reversal on an independent basis.

The record reflects undisputed and escalating harm. Appellant is unable to receive his life-sustaining IVIG infusions at the facility because there is no qualified nurse with recent experience available to administer his medication. Physician oversight and access to care is and has been conditioned on Appellant relinquishing control over his medical treatment by designating the facility physician as his primary care physician, despite Appellant not being fully examined by that physician and the existence of established treating specialists. Compounding this pressure, the facility physician altered Appellant's medications without consulting with Appellant or his primary care physician. When Appellant refused to submit to unsafe conditions or unauthorized changes in care, that refusal was characterized as "non-compliance" in his medical record further restricting his options as his medical condition continues to deteriorate. These actions have escalated pressure on Appellant to acquiesce to unsafe and unconsented treatment, precisely the type of coercive dilemma the Ninth Circuit recognizes as irreparable harm warranting immediate injunctive relief.

Under controlling Ninth Circuit precedent, Appellant is not required to prove definitive success on the merits to obtain preliminary

3

relief. When an Appellant raises serious questions that goes to the merits and causes catastrophic, irreversible harm, courts must act to preserve life and bodily integrity while legal questions are resolved. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *Leiva-Perez v. Holder*, 640 F.3d 962, 968-70 (9th Cir. 2011). Courts do not wait for harm before intervening. *Hernandez v. Sessions*, 872 F.3d 976, 995-996 (9th Cir. 2017); *Doe v. Kelly*, 878 F.3d 710, 719-722 (9th Cir. 2017).

Appellant seeks compliance with binding federal determinations already issued in his favor, specifically the QIO's finding that continued hospital-level services are required and that a safe discharge location must be secured, and OPM's final decision authorizing Long-Term Acute Care ("LTAC") benefits. Enforcing existing binding federal determinations constitutes equitable relief, not the creation of new rights.

The district court's denial of emergency relief rested on legal errors, including the misapplication of the preliminary-injunction standard, premature resolution of unsettled enforcement questions post-*Talevski*, failure to address independent disability-rights claims,

4

and an unduly narrow view of irreparable harm. By denying relief, the court did not preserve the status quo, but rather, it allowed Defendants' practices to continue placing Appellant under mounting pressure to accept unsafe care as his condition continues to worsen.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the Medicare Act and its implementing regulations (42 U.S.C. § 1395), the Federal Employees Health Benefits Act ("FEHBA") (5 U.S.C. § 8901 et seq.), the ADA (42 U.S.C. § 12101 et seq.), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), Patient Protection and Affordable Care Act § 1557 (42 U.S.C. § 18116), and 42 U.S.C. § 1983.

On October 27, 2025, the United States District Court for the Northern District of California entered an Order denying Appellant's *Ex Parte* Application for Injunctive and Declaratory Relief. ER-3. Although styled as a denial of a temporary restraining order (TRO), the Order effectively denied Appellant's emergency request for injunctive and declaratory relief.

Appellant sought emergency injunctive relief to prevent imminent medical harm, and the district court conducted a hearing. ER-7, ER-86. The court's order rested on legal conclusions that foreclose interim relief and left Appellant exposed to escalating, irreparable injury. Under these circumstances, the order is appealable under 28 U.S.C. § 1292(a)(1) as an interlocutory order refusing an injunction.

Appellant timely filed a notice of appeal on November 25, 2025. ER-163.

## STATUTORY AND REGULATORY AUTHORITIES

Relevant statutory and constitutional authorities appear in the Addendum to this brief.

## ISSUES PRESENTED FOR REVIEW

1. Whether Appellant possesses a judicially cognizable right to seek enforcement of binding federal administrative determinations, specifically Livanta's QIO decision and OPM's entitlement determination, where denial of interim relief would effectively nullify those determinations and deprive Appellant of access to medically necessary care.

2. Whether the district court erred in failing to apply the Ninth Circuit's serious-questions sliding-scale standard as to whether Defendants violated binding QIO reconsideration requirements under 42 C.F.R. § 405.1204 and § 482.43.

3. Whether The Regents of the University of California, as the governing authority responsible for discharge-planning policies at UC medical centers, were the proper defendant for injunctive relief despite UC Davis Medical Center not being separately named.

4. Whether the district court erred by declining to address Appellant's independent disability-discrimination claims under Section 504 of the Rehabilitation Act, the ADA, and ACA § 1557, each of which provides a private right of action to enforce access to medically appropriate care, independent of Medicare enforcement mechanisms.

5. Whether the district court erred by requiring specific proof that stigmatizing medical-record notations would cause future denial of care, rather than applying the Ninth Circuit standard that a reasonable probability of irreparable harm, including a serious

risk that such notations will prejudice providers and impair access to medically necessary care, is sufficient at the preliminary injunction stage.

## STATEMENT OF THE CASE

### A. Appellant's Medical Condition and Dependence on High-Level Care

Appellant John Doe is a disabled African-American federal employee whose rare autoimmune disorders, systemic sclerosis with dermatomyositis overlap, renders him medically fragile and severely immunocompromised. ER 13-19, ER-33-35. The condition places him at constant risk of infection and progressive medical decline, and it necessitates continuous physician supervision, skilled nursing services, coordinated physical and occupational therapy, rigorous infection-control measures, specialized wound care, and recurring intravenous treatment, including scheduled intravenous immunoglobulin ("IVIG") infusions. ER-13-19, ER-33-35.

Because Appellant's peripheral veins are no longer viable, all intravenous therapy must be administered through a surgically implanted central chest port, which constitutes his sole means of vascular access. ER-13-19, ER-33-35. Improper access or management

of that port presents an immediate and serious risk of infection, sepsis, thrombosis, or permanent loss of vascular access. ER-13-19, ER-33-35. Interruption or delay of IVIG therapy predictably exacerbates Appellant's immunocompromised state and substantially increases the risk of severe infection and medical emergency. ER-13-19, ER-33-35.

From March 2025 through early October 2025, Appellant was hospitalized at UC Davis Medical Center, an institution governed by The Regents of the University of California ("Regents"). ER-15, ER-34. During that period, UC Davis clinicians were fully aware of Appellant's medical fragility, his dependence on sterile port-based infusions, and the need for coordinated, high-level care and safe discharge planning to prevent foreseeable harm. ER-13-19, ER-33-39.

Prior to Appellant's hospitalization at UC Davis, UCSF Medical Center discharged Appellant under unsafe conditions. ER-39, ER-126. They further communicated to Alameda Health System that a court order would be required to discharge Appellant. ER-129-130. Alameda Health System staff noted this communication in Appellant's medical record in addition to characterizing Appellant as "hospital hopping" and "difficult". ER-18, ER-22-23, ER-129-130. There has never been a

9

judicial order to remove Appellant from a medical facility.

Nevertheless, Alameda Health System entered these statements in Appellant's electronic medical record, where they remain. Although the statements originated in Alameda Health System records, they appear in various hospital record platforms verbatim. ER-22-23. UC Davis had access to and reviewed Appellant's longitudinal medical records, including these and other non-clinical and stigmatizing notations, as part of Appellant's ongoing care and discharge planning. ER-22-23, ER 33-39.

## B. UC Davis Discharged Appellant While a QIO Reconsideration Was Pending

In early October 2025, UC Davis Medical Center initiated plans to discharge Appellant to Integrity Care Group ("Integrity"), a congregate living health facility (CLHF). ER-13-16. The record reflects that Integrity does not have on-site personnel qualified to access and manage a central chest port or provide specialized wound-care services and has minimal physician presence. ER-13-19, ER-33-47. Publicly available regulatory records reflect multiple substantiated deficiencies at Integrity, including deficiencies related to patient care, infection control, and clinical oversight. ER-14, ER-37-38.

10

On October 6, 2025, Appellant timely requested expedited reconsideration of UC Davis's discharge determination by Livanta QIO. ER-16, ER-35-36. Livanta notified UC Davis that the reconsideration request was pending. ER 16, 35-36.

UC Davis discharged Appellant while his expedited QIO reconsideration was still pending, transferring him to Integrity, a post-acute facility that UC Davis had reason to know lacked the capacity to meet his complex medical needs. ER-16, ER-3-36. Nothing in the record identifies any clinical or operational urgency necessitating discharge before completion of the expedited QIO review, particularly in light of Appellant's prolonged hospitalization and medical fragility. That premature discharge foreclosed the protective function of the QIO process and precipitated the medical emergency now before this Court.

## C. Livanta Determined That a Safe Discharge Had Not Been Secured

On October 8, 2025, Livanta issued its written reconsideration determination. ER-16, ER-51. Livanta acknowledged Appellant's complex medical condition and observed that multiple skilled nursing facilities had declined to accept him due to the level of care required. ER-51. Livanta concluded that Appellant continued to require the

11

services being furnished by UC Davis and determined that, although he might be medically stable for discharge from an acute-care perspective, no safe or appropriate discharge location had yet been identified. ER-51.

Livanta further determined that continued payment for Appellant's care was warranted pending the identification and arrangement of a discharge setting capable of meeting his medical needs, expressly noting that discharge in the absence of such arrangements posed unresolved patient-safety concerns. ER-51.

Despite this determination, UC Davis did not take steps to secure an alternative placement consistent with Livanta's findings. ER-16, 33-47. Rather than focusing on patient safety, continuity of care, or the development of an appropriate discharge plan, UC Davis chose to ignore the very safeguards Livanta deemed necessary to protect Appellant's health and well-being. ER-33.

### D. Medical Deterioration Following Transfer to Integrity

Following transfer to Integrity, Appellant's medical condition worsened in ways consistent with the level of care available at that facility. ER-13-19, ER-33-47. A coccygeal pressure ulcer has worsened with increased bleeding and tissue breakdown, coinciding with limited

wound-care resources and reduced clinical oversight. ER-33-47, ER-63-65. Integrity's medical director evaluated Appellant on October 7, 2025, but the record reflects no ongoing physician management despite reports of worsening wounds, missed infusions, and medication-related concerns. ER-33-47, ER-57-69.

Integrity staff acknowledged limited recent experience accessing central venous ports and indicated that refresher instruction would be required. ER-15-17, ER-41-43. Given the risk of infection and loss of Appellant's sole vascular access, Appellant elected to have his port de-accessed on October 15, 2025, rather than permit access by personnel without demonstrated competency. ER-43.

Medication administration at Integrity has continually been inconsistent. ER-33-47. The record reflects missed doses of prescribed medications, dosing irregularities, and delays in scheduled therapies. ER-33-47. Occupational therapy services has not been provided, and physical therapy cannot be safely continued due to facility limitations. ER-33-47. The deterioration experienced following Appellant's transfer occurred in the context of these documented limitations and formed the basis for the emergency relief sought in this appeal.

### E. OPM's Final LTAC Determination and BCBSA's Failure to Implement

The circumstances giving rise to this appeal developed over an extended period and were not unforeseen. On August 18, 2023, OPM issued a final, binding administrative determination directing Blue Cross Blue Shield Association ("BCBSA"), Appellant's FEHBA carrier, to authorize LTAC services for Appellant.[1] ER-49. In that decision, OPM determined that long-term acute care is medically necessary for Appellant's condition. ER-49.

Despite the finality of OPM's determination, BCBSA did not authorize LTAC placement. Over the ensuing two years, Appellant continued to experience repeated cycles of acute hospitalization followed by discharge to post-acute settings that were unable to provide the level

---

[1] BCBSA holds the master FEP contract with OPM and sets policies governing all participating local Blue plans, including Blue Shield of California. Local plans operate as licensed BCBSA affiliates under its oversight and authority, implementing BCBSA's policies in their service areas. BCBSA exercises direct control over FEP benefit determinations and is answerable to OPM for all local plan conduct. When local plans make coverage determinations or denials, they act pursuant to BCBSA's delegated authority and established procedures. BCBSA's master contract responsibility and policy control make it the proper party to defend FEP benefit disputes and the conduct of its licensed affiliates.

14

of care identified by OPM as medically necessary. ER-35-39, ER-134-142. This pattern resulted in temporary stabilization without durable placement capable of meeting Appellant's long-term medical needs. The October 2025 discharge and subsequent deterioration occurred against this backdrop and reflect the foreseeable consequences of the continued absence of LTAC authorization following OPM's final decision.

This case illustrates a recurring pattern of denial by delay that defeats meaningful access to federally authorized benefits. Although the Office of Personnel Management issued a final determination that Long-Term Acute Care ("LTAC") is medically necessary for Appellant's condition, that determination has never been implemented. Instead, Appellant has been subjected to a repeating cycle in which medically necessary care is initially denied, administrative review proceeds only as his condition deteriorates, and any favorable determination that arrives is not implemented. By the time review concludes, the treatment window has closed, a new care plan becomes necessary, and the process begins again.

This dynamic transforms administrative review from a mechanism of adjudication into a mechanism of attrition. Access to

benefits exists in theory but not in practice. Federal law does not permit a carrier to nominally acknowledge a binding federal determination while predictably defeating it through procedural delay. Where the administrative process consistently outlasts the medically necessary timeframe for treatment, denial by delay operates as denial outright.

This is not routine utilization review. OPM has already resolved medical necessity. Treating that final determination as effectively expiring each time Appellant's condition worsens would allow carriers to evade binding federal decisions through inertia, forcing medically fragile beneficiaries to repeatedly relitigate settled issues while their health deteriorates. At minimum, whether FEHBA permits such nullification of a final OPM determination presents a serious legal question. Given the foreseeable and escalating medical harm caused by this framework, interim equitable relief is necessary to prevent the administrative process from defeating the substantive right it was designed to secure.

## F. Preliminary Injunction Denial

On October 20, 2025, Appellant filed an *Ex Parte* Application for a Preliminary Injunction and Declaratory Relief. ER-7-73. The

application requested an order requiring Regents to arrange a medically
appropriate and safe placement consistent with Livanta's
reconsideration determination, and requiring to implement OPM's
August 18, 2023, LTAC determination. ER-7-73. The application was
supported by Appellant's verified declaration, photos of deteriorating
wounds, the Livanta determination, the OPM decision, and publicly
available regulatory records concerning the receiving facility. ER-7-73.

Following a hearing at which the district court acknowledged the
seriousness of Appellant's medical circumstances, the court denied the
requested relief. ER-3, ER-86-107. The court concluded that Appellant
could not obtain injunctive relief to enforce federal discharge-related
protections under § 1983, did not reach Appellant's independent
disability-discrimination claims, and determined that Appellant had not
established a likelihood of immediate, irreparable harm sufficient to
warrant emergency relief. ER-3-6.

## SUMMARY OF ARGUMENT

This appeal presents a focused but critical question: whether a
district court may deny emergency injunctive relief in the face of
escalating and undisputed medical risk by resolving unsettled merits

17

and enforcement questions, rather than applying the Ninth Circuit's serious-questions sliding-scale standard designed for precisely such emergencies. Controlling Ninth Circuit precedent requires preservation of health and bodily integrity while difficult legal questions remain unresolved. The district court took the opposite approach.

The district court expressly recognized that Appellant's condition is "undeniably serious" and that the circumstances of his discharge were "quite troubling," particularly given a federal QIO determination concluding that no safe discharge location had been secured. Despite those findings, the court denied relief based on its view that Appellant lacked a clearly established enforcement mechanism for certain federal protections and that the resulting harms were not sufficiently concrete. By doing so, the court imposed an unduly demanding standard at the emergency stage and permitted a medically precarious and worsening situation to persist while unresolved legal questions remained pending.

Ninth Circuit law does not require certainty of success on the merits at the preliminary-injunction stage. Where, as here, an Appellant raises serious questions going to the merits and the balance of hardships tips sharply in his favor, courts must act to preserve health

and bodily integrity while the case proceeds. *Alliance for the Wild Rockies*, 632 F.3d at 1134–35; *Leiva-Perez*, 640 F.3d at 975–76. This framework exists to prevent courts from resolving developing or unsettled legal issues at the emergency stage when doing so risks irreversible harm. The district court departed from this framework by resolving enforcement and pleading questions instead of applying the serious-questions standard required in this Circuit.

The record independently establishes a serious risk of irreparable harm. Following discharge to a setting that lacked port-qualified staff, consistent wound care, and meaningful physician presence. Appellant's central port was de-accessed, infusion therapy was interrupted, wounds worsened, and medication administration became inconsistent. At the preliminary injunction stage, Appellant was not required to prove ultimate injury or trace each adverse outcome to a single cause. It was sufficient to demonstrate a reasonable probability of irreparable harm, something the record amply shows. Courts are not required to wait for permanent injury, systemic infection, or death before intervening. *Hernandez*, 872 F.3d 976, 994-995 (9th Cir. 2017).

The harm is also coercive. By discharging Appellant to a setting known to lack the personnel and capacity to safely provide required treatment, the Regents effectively conditioned access to medically necessary care on Appellant's acceptance of unsafe treatment conditions. That discharge placed Appellant in an untenable position, choosing between bodily safety and access to essential medical services. The Ninth Circuit has recognized that such coerced choices themselves constitute irreparable harm warranting interim injunctive relief. *Doe v. Kelly*, at 727–28.

The district court further erred by denying relief based on pleading distinctions between UC entities at the emergency stage. Preliminary injunctive relief exists to prevent irreparable harm while pleadings are refined and claims clarified, not to deny life-preserving relief based on technical distinctions readily curable by amendment. *Cuviello v. City of Vallejo*, 944 F.3d 816, 833–34 (9th Cir. 2019). Where the Regents exercised governance over hospitalization, discharge planning, and placement decisions, and amendment was feasible and requested, denial of interim relief on this basis constituted an abuse of discretion.

20

Compounding that error, the district court failed to address Appellant's independent disability-discrimination claims under the ADA, Section 504 of the Rehabilitation Act, and ACA § 1557. Those statutes provide private rights of action independent of § 1983 and require covered entities to afford disabled individuals meaningful access to medically appropriate care. Each claim warranted consideration in the emergency analysis and provided an independent basis for interim relief.

Separately and independently, Appellant sought interim enforcement of a final benefits determination issued by the OPM under FEHBA, directing authorization of LTAC rehabilitative benefits. That determination provides an additional, freestanding basis for equitable relief pending adjudication.

The balance of equities and the public interest overwhelmingly favor relief. Appellant faces ongoing risk of serious medical deterioration. Defendants are asked only to comply with existing federal obligations to arrange discharge to a location capable of providing the level of care Appellant requires, consistent with the QIO determination, and to implement a final OPM benefits decision. Preserving patient

safety and preventing irreversible medical harm while unsettled legal questions are adjudicated not only aligns with the public interest, it advances it.

Because Appellant raised serious questions on the merits, demonstrated a reasonable probability of irreparable harm, and established that the balance of equities and public interest tip sharply in his favor, the district court abused its discretion in denying emergency injunctive relief.

## STANDARD OF REVIEW AND LEGAL STANDARD FOR INJUNCTIVE RELIEF

A district court's denial of a temporary restraining order or preliminary injunction is reviewed for abuse of discretion. *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004). An abuse of discretion occurs where the court applies an incorrect legal standard, misapprehends the governing law, or bases its decision on clearly erroneous factual findings. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005).

Legal determinations underlying the denial of injunctive relief, including questions of statutory interpretation and the availability of equitable remedies, are reviewed de novo. *GoTo.com, Inc. v. Walt Disney*

*Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). Whether federal statutes or regulations create enforceable rights presents a pure question of law subject to de novo review. Likewise, a district court's failure to address claims that were fully presented constitutes legal error. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1063 (9th Cir. 2014).

Requests for preliminary injunctive relief are governed by the four-factor framework set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent relief; (3) the balance of equities; and (4) the public interest.

In this Circuit, those factors are applied on a sliding scale. An Appellant need not demonstrate a likelihood of success on the merits where serious questions are raised, so long as the balance of hardships tips sharply in the Appellant's favor and the Appellant demonstrates irreparable harm and that the injunction serves the public interest. *Alliance for the Wild Rockies*, 632 F.3d 1127 at 1134–35. This approach reflects the Ninth Circuit's longstanding recognition that courts should not resolve unsettled or developing legal questions at the emergency stage when delay risks irreversible harm.

23

The Ninth Circuit has further emphasized that district courts must meaningfully consider all four Winter factors, even when denying relief. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). A court abuses its discretion when it effectively resolves an injunction request based on one or two factors while failing to properly weigh the balance of equities or the public interest.

Appellant proceeds under the serious-questions sliding-scale standard. He raised substantial legal questions concerning the enforceability of binding administrative determinations and independent disability-rights statutes, demonstrated a reasonable probability of irreparable harm, and established that the balance of equities and the public interest weigh decisively in his favor. The district court's failure to apply this governing framework constitutes reversible error.

## ARGUMENT

### A. The District Court Abused Its Discretion by Applying the Wrong Standard for Preliminary Injunctive Relief

A district court abuses its discretion when it applies an incorrect legal standard, prematurely resolves unsettled questions going to the merits, or discounts evidence demonstrating a serious risk of

irreparable harm. Alliance for the Wild Rockies, 632 F.3d at 1131 (9th Cir. 2011); Leiva-Perez, 640 F.3d 962 at 966–67.

Under controlling Ninth Circuit precedent, an Appellant need not establish a likelihood of success on the merits to obtain preliminary injunctive relief. Where an Appellant raises serious questions going to the merits and demonstrates a reasonable probability of irreparable harm, an injunction is appropriate if the balance of hardships tips sharply in the Appellant's favor and the injunction serves the public interest. *Alliance*, 632 F.3d at 1134–35.

Here, the balance of equities tips sharply in Appellant's favor. Appellant faces a serious risk of irreversible medical harm, including loss of vascular access and life-threatening infection, while Defendants face no comparable hardship beyond compliance with existing federal obligations. Where one party faces a risk of irreparable harm and the other does not, the balance of hardships ordinarily favors the party at risk. *Sierra Club v. Trump*, 929 F.3d 670, 704 (9th Cir. 2019).

Rather than applying this sliding-scale framework, the district court treated Appellant's emergency application as requiring definitive resolution of contested enforcement and merits questions, particularly

25

whether federal discharge-related protections and QIO determinations are enforceable under § 1983. That approach was inconsistent with Ninth Circuit law. Preliminary injunctive relief exists to preserve life, health, and bodily integrity while difficult legal questions are litigated, not to resolve those questions in the first instance at the emergency stage. *Leiva-Perez*, 640 F.3d at 966; S*ammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002).

## B. Appellant Raised Serious Questions Going to the Merits Based on Multiple Independent Federal Violations

At minimum, Appellant raised serious questions going to the merits regarding Defendants' compliance with mandatory, beneficiary-protective federal requirements. Under Ninth Circuit precedent, that showing, combined with irreparable harm and sharply favoring equities, is sufficient to warrant preliminary injunctive relief. *Alliance for the Wild Rockies*, 632 F.3d at 1134–35.

### 1. The Regents of the University of California Are the Proper Defendant and Real Party in Interest

As a matter of California constitutional law and longstanding federal precedent, Regents are the only proper defendant for claims arising from the operation of UC medical centers, including claims based on unsafe discharge practices. The University of California is a single

26

constitutional entity governed by The Regents, and UC campuses and medical centers lack separate juridical existence absent express legislative authorization. Cal. Const. art. IX, § 9(a), (f).

Here, the Regents' status as the real party in interest is further confirmed by their voluntary appearance and defense on behalf of UCSF Medical Center in the Complaint, as well as their appearance at the preliminary injunction hearing involving the UC Davis Medical Center discharge. These appearances reflect the Regents' acknowledgment that they possess the substantive legal interest in claims challenging UC hospital discharge practices. See Fed. R. Civ. P. 17(a).

This case includes concerns surrounding the systemic unsafe discharge practices attributable to the Regents, not a single campus-specific event. Appellant's discharge from UC Davis Medical Center represents the fourth unsafe discharge from a Regents-operated hospital, following prior discharges from other UC facilities.

Accordingly, the fact that UC Davis Medical Center was not separately named as a defendant is not prejudicial. The Regents' appearance fully encompasses the conduct of UC Davis and all other UC medical centers they govern. Denial of emergency relief based on

campus-level pleading distinctions, particularly where amendment is feasible and requested, constitutes legal error. See *Cuviello v. City of Vallejo*, 944 F.3d at 833–34.

### 2. The Regents Discharged Appellant While a QIO Reconsideration Was Pending, Raising Serious Questions Under 42 C.F.R. § 405.1204

Federal regulations governing expedited discharge appeals provide that when a beneficiary timely requests QIO reconsideration, the reconsideration decision is binding on the provider, and the appeal process is intended to protect beneficiaries from premature or unsafe discharge while review is underway. See 42 C.F.R. § 405.1204.

The expedited QIO reconsideration framework is designed to function as a protective mechanism, not a post hoc reimbursement process. Its purpose is to ensure that discharge decisions affecting medically fragile beneficiaries are not effectuated in a manner that nullifies meaningful medical review before patient-safety concerns are resolved. Where, as here, a beneficiary timely invokes expedited reconsideration and the QIO subsequently determines that a safe discharge location has not been secured, effectuating discharge during the pendency of that review irreversibly defeats the statutory safeguard

Congress and Centers for Medicare and Medicaid Services (CMS)

created. The resulting harm is not merely financial; it is the loss of the

very protection the expedited appeal process exists to provide. At

minimum, whether the Regents' actions impermissibly undermined the

protective function of the QIO process presents a serious question that

should have been resolved in Appellant's favor at the emergency stage.

### 3. The Regents Failed to Ensure a Safe and Appropriate Discharge in Violation of 42 C.F.R. § 482.43

Federal law requires hospitals to discharge patients only after

confirming that appropriate post-hospital services are available and

that the transition can be accomplished safely. 42 C.F.R. § 482.43.

Here, the Regents discharged Appellant to a congregate living health

facility that lacked personnel qualified to manage his complex medical

needs, including infusion therapy, wound care, and medication

management. In the days following discharge, Appellant suffered

interrupted IVIG treatment, worsening wounds, and medication

irregularities, harms that were foreseeable given the facility's limited

clinical capacity. Whether a discharge under these circumstances

satisfied the Regents' regulatory duty to ensure a safe and appropriate

transition of care presents a serious question going to the merits under § 482.43.

### 4. The Regents' Failure to Implement the QIO Reconsideration Determination Raises Serious Questions of Federal Compliance

Upon reviewing the post-acute discharge plan developed by UC Davis Medical Center for Appellant, Livanta issued a reconsideration determination concluding that Appellant continued to require the hospital-level services being furnished by UC Davis and that a safe and appropriate discharge location had not yet been secured. Although Livanta acknowledged that Appellant might be medically stable from a short-term acute-care standpoint, it expressly found that no post-acute setting capable of safely meeting his medical needs had been identified or secured. Despite that determination, the Regents did not return Appellant to UC Davis or arrange transfer to a setting capable of providing the hospital level of care Livanta determined was still required.

This failure is significant because the Medicare QIO framework is not concerned solely with whether a patient can physically leave an acute-care hospital, but whether a lawful and safe transition of care has

actually been accomplished. Where a QIO determines that discharge planning remains incomplete and patient-safety concerns persist, the hospital retains responsibility to ensure continuity of care at an appropriate level. Allowing a medically fragile patient to remain in a placement that lacks the capacity to provide required services, after the QIO has found that no safe discharge location exists, undermines the protective function of the expedited review process and raises serious questions of federal noncompliance.

Critically, the record demonstrates that neither a Skilled Nursing Facility ("SNF") nor a Congregate Living Health Facility ("CLHF") could meet Appellant's needs. SNFs are designed to provide intermittent skilled nursing and rehabilitative services with periodic physician oversight; they do not provide continuous hospital-level care, daily physician management, or the infrastructure necessary for complex infusion therapies and advanced wound care. CLHFs operate at an even lower level of acuity, typically lacking on-site physicians, continuous hospital-level care, or the ability to safely manage implanted port access and immunocompromised patients. Multiple SNFs declined

placement precisely because Appellant's wound complexity and IVIG requirements exceeded their scope of care.

By contrast, LTAC facilities are specifically designed for medically complex patients who no longer require short-term acute hospitalization but continue to need extended hospital-level services, including daily physician oversight, advanced wound management, continuous skilled nursing, and safe administration of high-risk infusion therapies. Livanta's determination that Appellant required continued services necessarily pointed toward an LTAC-level setting, not a SNF or CLHF, because only an LTAC could provide the level of care required while effectuating a lawful discharge.

At minimum, the Regents' failure to act on Livanta's reconsideration determination, by neither returning Appellant to the hospital nor securing transfer to an LTAC-capable setting, raises serious questions regarding compliance with federal discharge-planning obligations and post-QIO review duties. Given the undisputed medical risk and the absence of any safe alternative placement, those questions should have been resolved in Appellant's favor at the emergency stage.

### 5. The District Court Erred by Treating § 1983 Enforceability as Dispositive at the Emergency Stage

The district court denied emergency relief on the ground that Appellant lacked a private right of action under 42 U.S.C. § 1983 to enforce certain federal discharge-related protections, relying principally on *Save Our Valley v. Sound Transit*, 335 F.3d 932 (9th Cir. 2003). That approach misapplied the governing standard for preliminary injunctive relief and prematurely resolved unsettled merits questions.

At the emergency stage, Appellant was not required to obtain a definitive ruling on the ultimate availability of § 1983 as an enforcement mechanism. Appellant sought interim equitable relief to prevent ongoing, serious medical harm while the case proceeds, not a final determination of the legal mechanism for enforcing federal protections.

Under Ninth Circuit precedent, where serious questions exist and irreparable harm is shown, courts must preserve the status quo while legal issues are litigated. Uncertainty regarding the ultimate merits of a legal theory does not justify denial of interim relief at the threshold. The Supreme Court has made clear that disputes over the availability or scope of a federal cause of action are merit questions and do not

justify denying preliminary relief where irreparable harm is ongoing. *Bell v. Hood*, 327 U.S. 678, 682–83 (1946).

Moreover, the district court's categorical reliance on *Save Our Valley* is inconsistent with intervening Supreme Court authority. In *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 177–80 (2023), the Court reaffirmed that Spending Clause statutes may create individual rights enforceable under § 1983 and rejected categorical rules barring such enforcement in the healthcare context. Although *Talevski* did not decide the enforceability of the specific discharge and appeal provisions at issue here, it makes clear that enforceability requires a careful, provision-specific analysis. At a minimum, *Talevski* establishes that Appellant's enforcement theory presents a serious question going to the merits, precisely the circumstance in which preliminary injunctive relief is appropriate under Ninth Circuit law.

By treating § 1983 enforceability as dispositive at the emergency stage, the district court applied the wrong legal standard and abused its discretion.

**6. FEBA Independently Authorizes Enforcement of OPM's Final Benefits Decision Against the Carrier**

34

### a. The Statutory Text Imposes a Mandatory, Non-Discretionary Duty on the Carrier

The Federal Employees Health Benefits Act ("FEHBA") expressly provides that"

> "[e]ach contract … shall require the carrier to agree to pay for or provide a health service or supply in an individual case if the Office finds that the employee … is entitled thereto under the terms of the contract." 5 U.S.C. § 8902(j) (emphasis added)

This language is unequivocally mandatory. By directing that every FEHBA contract "shall require" the carrier to provide or pay for covered services once OPM determines entitlement, Congress imposed a non-discretionary legal obligation on carriers. The statute does not authorize the carrier to second-guess, delay, or decline compliance with OPM's final determination. Once OPM finds entitlement, the carrier's duty attaches by operation of federal law and is incorporated into the contract as a binding condition of participation in the FEHBA program. Accordingly, a carrier's refusal to implement a final OPM benefits decision is not an exercise of permissible claims administration; it is a failure to perform a federally mandated obligation. Whether FEHBA authorizes equitable enforcement of that obligation against a noncompliant carrier, particularly where delay results in serious

35

medical harm, presents, at minimum, a substantial and unresolved legal question going to the merits. In the face of ongoing irreparable injury, that question could not properly be resolved against Appellant at the emergency stage, and instead required preservation of Appellant's access to the benefits OPM has already adjudicated in his favor.

### b. Section 8902(j) Imposes a Mandatory Federal Obligation Enforceable Through Equitable Relief

Section 8902(j) does not expressly create a standalone private right of action in the manner of statutes enforced through 42 U.S.C. § 1983. Appellant does not contend otherwise. Instead, the statute establishes a mandatory federal obligation that binds FEHBA carriers once OPM issues a final benefits determination, and that obligation is judicially enforceable through equitable relief to prevent nullification of federal law.

While § 8902(j) may not supply a separate cause of action standing alone, courts have long recognized that mandatory federal obligations embedded in federal contracts are enforceable in equity, particularly where noncompliance would defeat the very entitlement Congress required federal agencies to confer. See *Bowen v. Massachusetts*, 487 U.S. 879, 893–900 (1988).

Here, Appellant does not seek to expand benefits, re-litigate medical necessity, or bypass the FEHBA administrative scheme. He seeks implementation of a final, binding OPM determination that has already issued and that federal law requires the carrier to honor. Allowing a carrier to refuse to implement that determination through delay or inaction would render § 8902(j) a nullity and permit compliance in theory but not in practice.

Accordingly, the relevant question at the preliminary-injunction stage is not whether § 8902(j) creates a private damages remedy, but whether a federal court may issue equitable relief to compel compliance with a mandatory federal obligation where ongoing noncompliance threatens irreparable harm. At minimum, that question presents a serious issue going to the merits, and under Ninth Circuit law it should have been resolved in Appellant's favor at the emergency stage given the undisputed medical risk.

### c. FEHBA's Statutory Framework and OPM's Final Determination Establish Ongoing, Irreparable Harm From Continued Carrier Noncompliance

This appeal arises from the continued failure to implement a final and binding benefits determination issued by OPM. More than two

years ago, OPM determined that LTAC was medically necessary for Appellant's condition. Yet BCBSA has not implemented that determination, depriving Appellant of access to the hospital-level of care federal authorities have already adjudicated to be required.

This prolonged noncompliance has produced ongoing and escalating medical harm. FEHBA's statutory framework does not contemplate that a beneficiary must endure repeated deterioration, unsafe discharge, and medical crisis while a carrier disregards a final federal mandate. Where a binding OPM determination remains unenforced and the resulting harm is continuous, irreparable injury is established as a matter of law.

Appellees have suggested that Appellant previously agreed that BCBSA must be dismissed and that relief may lie only against OPM. This contention misstates both the record and the law. In opposing dismissal, Appellant indicated a willingness to seek voluntary dismissal of BCBSA's FEHB cause of action without prejudice, based on a mistaken understanding of FEHBA's channeling provisions, not as a concession that carriers are immune from enforcement or that only OPM may be sued.

Appellant did not dismiss his FEHBA claims with prejudice, did not obtain any ruling on FEHBA's scope, and did not concede that carriers may disregard final OPM determinations without consequence. Upon further analysis, it is clear that FEHBA's channeling provisions govern challenges to initial benefit determinations and judicial review of OPM denials; they do not clearly foreclose equitable enforcement of a final, binding OPM decision against a noncompliant carrier.

The harm here is neither speculative nor complete. Because the OPM determination has never been implemented, the injury is ongoing. Appellant remains deprived of the hospital-level of care federal authorities have already determined is medically necessary. Interpreting OPM's decision as nullified by delay, by the absence of a particular hospitalization, or by serial administrative obstacles would allow carriers to evade binding federal mandates through inaction, precisely the result FEHBA was enacted to prevent.

FEHBA likewise does not require Appellant to repeatedly re-litigate medical necessity through new administrative appeals each time his condition deteriorates. Forcing serial exhaustion in the face of an existing final determination raises serious concerns that the

administrative process itself would defeat the substantive entitlement Congress created. See *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191– 93 (2023). At the emergency stage, unresolved questions of this magnitude—combined with continuing medical harm, should have weighed decisively in favor of interim relief.

BCBSA is therefore the proper party for enforcement. FEHBA expressly requires that each carrier contract obligate the carrier to "pay for or provide" covered services once OPM finds entitlement. 5 U.S.C. § 8902(j). OPM does not deliver medical care and does not administer claims; BCBSA does. Because Appellant seeks implementation and not revision of OPM's final decision, relief properly runs against the carrier charged by federal law with executing that determination.

## C. The District Court Abused Its Discretion by Rejecting Irreparable Harm Despite Undisputed Evidence of Escalating Medical Danger

The district court expressly recognized that Appellant's medical condition was undeniably serious and that the circumstances surrounding his discharge were quite troubling. Yet it nevertheless concluded that irreparable harm had not been shown. That determination cannot be upheld in light of the undisputed record or

controlling Ninth Circuit precedent. Where ongoing medical conditions expose a patient to escalating risk of serious injury or death, irreparable harm is established as a matter of law.

### 1. Serious Threats to Health and Bodily Integrity Constitute Irreparable Harm as a Matter of Law

The record demonstrates continuing medical jeopardy: interruption of scheduled IVIG therapy; worsening, bleeding pressure wounds; inconsistent medication administration; lack of rehabilitative therapy; and absence of continuous physician oversight. Each condition independently increases Appellant's risk of infection, rapid deterioration, and emergency hospitalization. Taken together, they establish an ongoing and escalating threat to health and bodily integrity.

Ninth Circuit precedent is unequivocal. Threats to physical safety and serious medical risk constitute irreparable harm, even where ultimate injury has not yet occurred. *Hernandez v. Sessions*, 872 F.3d at 994–95.

By discounting these undisputed medical risks and effectively requiring proof of catastrophic injury already realized, the district court applied an impermissibly narrow conception of irreparable harm. That

approach is inconsistent with Ninth Circuit law and constitutes an abuse of discretion.

## 2. Coercion Through Deprivation Constitutes Independent Irreparable Harm

The irreparable harm here is not confined to physical deterioration alone. It also arises from coercive conditions imposed through the deprivation of safe and appropriate medical care. Following discharge, Appellant was placed in circumstances where access to prescribed, life-sustaining treatment was effectively conditioned on his acceptance of arrangements that posed substantial risk to his health and bodily integrity.

The record establishes that personnel qualified to safely access and manage Appellant's central venous port were unavailable. As a result, Appellant was presented with an untenable choice: permit unqualified staff to attempt port access, risking infection, thrombosis, or permanent loss of vascular access, or forgo prescribed infusion therapy altogether. Physician oversight was similarly conditioned on Appellant's agreement to replace his established primary care physician and treating specialists with a facility physician, despite the absence of consultation with Appellant or his existing medical team. When Appellant declined

these unsafe or unauthorized conditions, his refusal was documented as "non-compliance," further narrowing access to care as his medical condition worsened.

Appellant's refusal to permit unqualified port access was not an intervening cause of harm; it was a medically necessary response to conditions that themselves created unacceptable risk. The coercive deprivation arises from the absence of qualified personnel capable of safely administering prescribed therapy, not from Appellant's effort to avoid foreseeable infection or loss of vascular access. Ninth Circuit law recognizes that harm arises where an individual is placed in a position where exercising basic self-protection results in deprivation of essential services. *Doe v. Kelly*, 878 F.3d at 727–28.

By denying emergency injunctive relief, the district court allowed these coercive conditions to persist and intensify, exposing Appellant to escalating medical danger while eroding the statutory and constitutional protections designed to prevent precisely this form of compelled choice. That independent coercive injury satisfies the irreparable-harm requirement and further demonstrates that denial of interim relief was an abuse of discretion.

### 3. Loss of the QIO appeal process constitutes deprivation of a federally guaranteed procedural protection and establishes irreparable harm as a matter of law

Congress created the expedited QIO review process to prevent unsafe hospital discharge and to preserve patient safety pending independent medical review. See 42 U.S.C. § 1395ff(c); 42 C.F.R. §§ 405.1200–405.1206. Where a beneficiary is discharged before that review can be completed, the procedural safeguard itself is extinguished, rendering the statutory protection meaningless. The injury in such circumstances is irreparable because the process was designed to operate before discharge and cannot be restored after the fact. See *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978); *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Hernandez*, 872 F.3d at 994–995.

### 4. Stigmatizing Medical-Record Notations Create Ongoing and Irreparable Barriers to Care

The district court erred by rejecting Appellant's medical-record harm based on an unduly narrow application of Winter and Rule 65(b), while accepting Appellee's characterization of the issue as speculative, non-causal, and incompatible with preservation of the status quo. That analysis misapprehends both the nature of the harm and the governing legal standards.

### a. Failure to Properly Apply the Winter Factors and Rule 65(b)

At the preliminary injunction stage, Appellant was required to demonstrate a likelihood of immediate irreparable harm, not to prove ultimate entitlement to permanent relief or to establish certainty of downstream injury. *Winter*, 555 U.S. at 22; Leiva-Perez, 640 F.3d 962 at 966–67. The district court instead demanded proof that specific third parties had already denied care because of particular record entries, effectively collapsing irreparable harm into final causation and merit determinations.

That standard is incompatible with Rule 65(b), which exists precisely to prevent harm that is immediate, structural, and difficult to unwind once it occurs. Where harm flows from the continued operation of a system, here, the ongoing dissemination and reliance on stigmatizing medical records, courts do not require Appellants to wait until exclusion is complete or irrevocable.

### b. Identification of Stigmatizing Record Categories Is Sufficient at the Emergency Stage

The record establishes that Appellant's medical file contains recurring categories of non-clinical, stigmatizing characterizations that

45

operate as ongoing barriers to access to care. Appellant identified these categories with adequate specificity for purposes of emergency relief, including repeated labels describing him as "non-compliant," "difficult," and "hospital hopping," as well as a demonstrably false narrative suggesting that court intervention was required to effectuate his discharge.

At the preliminary injunction stage, Appellant was not required to catalogue every instance of these descriptors across interoperable electronic health record systems or to litigate their ultimate accuracy or permanence. The governing standard requires only a showing of a reasonable probability that the continued presence and dissemination of such notations creates an immediate and ongoing risk of exclusion from medically appropriate care. That showing was made.

Nor does the availability of emergency relief turn on whether the challenged descriptors were subjectively believed by their authors. The harm alleged arises from the objective function of these non-clinical evaluations within modern healthcare systems. Once embedded in electronic health records, such labels travel forward through health information exchanges and materially influence admission decisions,

placement determinations, and authorization of services, particularly for medically complex and disabled patients. Their impact is prospective and structural, not retrospective or reputational.

Interim relief does not require adjudication of the ultimate accuracy or propriety of these entries. It requires only recognition that their continued prospective use and dissemination poses a serious and immediate threat to access to care. Requiring granular, entry-by-entry adjudication at the emergency stage would defeat the protective purpose of Rule 65 by allowing irreparable harm to continue while the very mechanism causing that harm remains operative.

### c. Preserving the Status Quo Requires Halting Ongoing Dissemination of Harmful Information

Preservation of the status quo does not require courts to allow the continued operation of an injurious practice. Rather, where harm flows from the ongoing dissemination of stigmatizing information, the relevant status quo is the last lawful and uncontested condition before that harm began.

In cases involving ongoing dissemination of harmful information, the status quo is not the continued operation of the injurious condition, but the last uncontested condition before the harm occurred. *GoTo.com, Inc.*

47

*v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). Here, the harm arises from the active circulation and reliance on stigmatizing, non-clinical notations, not from their historical existence in Appellant's records. Interim relief narrowly tailored to prevent the continued prospective use or transmission of those characterizations restores, rather than disrupts, the status quo ante.

Courts routinely grant injunctive relief to halt the ongoing dissemination of harmful or misleading information where its continued circulation causes present injury, even when the information already exists in some form.

Accordingly, the relevant status quo for purposes of preliminary relief is Appellant's access to medical care free from stigmatizing, non-clinical labels that operate prospectively to restrict placement, authorization, and treatment decisions. Enjoining continued dissemination preserves the last lawful condition before the injury—not the mechanism by which the injury continues.

### d. Causation at the Preliminary Injunction Stage Requires Probability, Not Proof

Under Ninth Circuit law, irreparable harm may be established by showing a reasonable probability that challenged conduct materially

contributes to ongoing injury. *Hernandez v. Sessions*, 872 F.3d at 994-995 (9th Cir. 2017). Appellant made that showing. The medical record here functions as a prospective barrier to access, shaping provider behavior and placement decisions in real time.

Empirical evidence confirms this mechanism. Peer-reviewed research demonstrates that stigmatizing language in medical records alters clinician decision-making, reduces access to care, and disproportionately affects Black patients. See, e.g., Michael G. Sun et al., *Negative Patient Descriptors: Documenting Racial Bias in the Electronic Health Record*, 41 Health Affs. 203 (2022); Anna Goddu et al., *Do Words Matter? Stigmatizing Language and the Transmission of Bias in the Medical Record*, 33 J. Gen. Internal Med. 685 (2018). These studies provide context for how stigmatizing language in medical records predictably affects downstream care decisions; the irreparable harm here is independently established by record evidence showing that such characterizations exist in Appellant's file and are routinely transmitted and relied upon in placement and care determinations.

## D. The District Court's Error Warrants Reversal

The injury at issue is not reputational in the abstract. It is the continuing and concrete risk that stigmatizing medical-record notations

will exclude a medically fragile patient from medically appropriate placement and treatment. Each transmission of Appellant's medical record carries forward non-clinical judgments portraying him as "difficult," "non-compliant," or undesirable to manage, an impression further reinforced by a demonstrably false narrative suggesting that court intervention was required to effectuate his discharge. In the healthcare context, where placement decisions are time-sensitive and opportunities are lost in real time, this form of exclusion inflicts harm that cannot be repaired after the fact. Once a placement is denied or delayed, the resulting medical consequences cannot be undone through damages or later correction of the record.

By dismissing this harm as speculative, the district court applied an incorrect legal standard. Appellant was required to show a reasonable probability of irreparable harm, not definitive proof of downstream denial or permanent injury. He satisfied that burden by demonstrating that stigmatizing medical-record notations were actively operating as an ongoing barrier to access to care, and that interim relief was necessary to prevent further irreparable injury.

That showing was sufficient. The district court's failure to credit it, and its insistence on a heightened evidentiary burden at the emergency stage, constituted an abuse of discretion warranting reversal.

### E. The District Court Erred by Denying Interim Relief Without Analyzing Appellant's ADA, Section 504, and ACA § 1557 Claims

The district court denied emergency relief based on pleading distinctions and unresolved enforcement questions, rather than applying the governing preliminary-injunction standard and addressing the full scope of claims properly before it. Ninth Circuit precedent makes clear that courts may not deny interim relief based on technical or curable pleading issues where life and bodily integrity are at stake. *Sammartano*, 303 F.3d 959 at 965; Cuviello v. City of Vallejo, 944 F.3d 816 at 833. The purpose of preliminary injunctive relief is to prevent irreparable harm while claims are adjudicated or refined—not to withhold protection based on formalistic distinctions.

Even if the district court harbored uncertainty regarding one enforcement theory, it was required to assess all four Winter factors as to each independent claim properly before it. The failure to analyze irreparable harm, equities, and public interest in connection with

51

Appellant's ADA, Section 504, and ACA § 1557 claims, each of which provides an independent basis for relief, constitutes reversible error. *California v. Azar*, 911 F.3d at 575.

More fundamentally, the district court failed to address Appellant's independently pleaded claims under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Section 1557 of the Affordable Care Act. Those statutes provide direct private rights of action and impose affirmative obligations on covered entities to ensure that individuals with disabilities are not excluded from, denied the benefits of, or subjected to discrimination in access to medical care. Critically, these claims do not depend on § 1983 enforceability of Medicare regulations or on resolution of contested administrative-law questions.

Under settled Supreme Court and Ninth Circuit precedent, disability-rights statutes require covered entities to provide meaningful access to medically appropriate services and to avoid practices that, in operation, deny such access to individuals with disabilities. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Meaningful access is denied where a

patient is discharged to a setting that is structurally incapable of providing the care his disability requires.

Here, Appellant alleged, and supported with evidence, that he was discharged to a facility that lacked the ability to safely provide sterile port access, infusion therapy, complex wound care, rehabilitative services, and consistent physician oversight. For a port-dependent, immunocompromised patient, placement in such a setting operates as an exclusion from medically appropriate care based on disability. This denial of access constitutes actionable discrimination under the ADA, Section 504, and ACA § 1557, as a matter of law.

By failing to analyze these claims at all, the district court applied an incomplete legal framework and omitted an independent basis for interim relief. This alone constitutes reversible error, particularly at the emergency stage where the court was required to consider all pleaded theories that could support protection from irreparable harm.

## F. The Balance of Equities and the Public Interest Tip Sharply in Appellant's Favor

The balance of equities overwhelmingly favors Appellant. He faces an ongoing and imminent risk of catastrophic harm, including permanent loss of vascular access, systemic infection, and death, absent

immediate intervention. These are not speculative injuries; they are the predictable consequences of continued exposure to unsafe discharge conditions and interrupted care. Defendants, by contrast, face no comparable hardship. The relief sought requires only compliance with existing federal obligations—arranging discharge consistent with a binding QIO determination and implementing a final OPM decision authorizing LTAC-level care. Courts routinely hold that compliance with federal law is not a cognizable equitable injury. *Doe v. Kelly*, 878 F.3d 710 at 727–28.

The public interest likewise weighs decisively in favor of relief. Federal discharge protections, expedited QIO review, and FEHBA's benefits framework exist to safeguard medically fragile patients from precisely the situation presented here, being forced into unsafe care while legal and administrative protections are rendered meaningless by delay and noncompliance. Granting interim relief advances the public interest in enforcing federal health-care mandates, preserving the integrity of administrative review processes, and preventing life-threatening harm while serious legal questions are adjudicated. Where

enforcement of federal law prevents grave medical injury, the public interest and equities not only favor relief, they compel it.

## G. Relief Is Warranted Under the Ninth Circuit's Sliding-Scale Standard

Appellant satisfied the Ninth Circuit's sliding-scale standard by raising serious questions going to the merits, establishing ongoing and irreparable harm, and demonstrating that the balance of equities and the public interest tip sharply in his favor. Under controlling precedent, that showing warrants immediate injunctive relief. *Alliance for the Wild Rockies*, 632 F.3d at 1134–35.

Where, as here, the record is fully developed and the governing legal standards were misapplied, this Court has authority to grant interim injunctive relief directly or to remand with instructions for immediate entry of such relief. *Leiva-Perez*, 640 F.3d 962 at 970; 28 U.S.C. § 2106.

Specifically, the Court should order that (1) Appellant be immediately removed from the unsafe discharge setting and placed in a medically appropriate facility capable of providing required care, and (2) Blue Cross Blue Shield Association implement the Office of Personnel Management's final determination authorizing LTAC benefits. Alternatively, the Court should reverse and remand with

instructions that the district court enter such preliminary injunctive relief forthwith. All remaining issues may be remanded for adjudication under the correct legal standards. Immediate injunctive relief is necessary to preserve Appellant's life and federally protected rights while those proceedings continue.

## CONCLUSION

This appeal seeks enforcement of binding federal determinations that were disregarded in circumstances presenting an ongoing medical emergency. Federal law establishes mandatory protections during expedited Medicare discharge review, including the requirement that hospitals refrain from effectuating discharge until a safe and appropriate post-acute placement is actually secured. Those protections were violated here. Federal law likewise imposes a mandatory, non-discretionary obligation on FEHBA carriers to implement final benefits determinations issued by the OPM. This obligation has remained unfulfilled for more than two years, exposing Appellant to foreseeable, escalating, and life-threatening harm.

The record satisfies the governing standard for emergency injunctive relief in this Circuit. Appellant raised substantial and

unresolved federal questions concerning compliance with Medicare discharge protections, the effect of a binding QIO determination, equitable enforcement of a final OPM benefits decision, and the denial of meaningful access to care under the ADA, Section 504, and ACA § 1557. He further established an ongoing and imminent risk of grave, irreversible medical injury. The balance of equities and the public interest weigh decisively in favor of enforcing existing federal mandates, not suspending them. Compliance imposes no cognizable hardship on Appellees; continued noncompliance threatens Appellant's life.

The district court nevertheless denied protection by resolving unsettled enforcement questions at the emergency stage, elevating curable pleading formalities, discounting concrete medical risk, and failing to address independently pleaded disability-rights claims. This contravenes controlling Ninth Circuit precedent and constitutes an abuse of discretion.

Accordingly, Appellant respectfully requests that this Court reverse the district court's denial of emergency injunctive relief and grant preliminary injunctive relief, or, in the alternative, reverse and

remand with instructions that such relief be entered immediately,
narrowly tailored to prevent further medical harm while this litigation
proceeds. Specifically, Appellant requests an order requiring that:

1. The Regents of the University of California, or any successor
   entity exercising control over Appellant's hospitalization,
   discharge planning, or placement decisions, immediately remove
   Appellant from the unsafe post-acute setting to which he was
   transferred and either:

   (a) readmit him to hospital-level care, or

   (b) arrange prompt placement in a medically appropriate facility
   capable of safely providing sterile central-port access, IVIG
   infusion therapy, complex wound care, physical and occupational
   rehabilitative services, and meaningful physician oversight,
   consistent with the Quality Improvement Organization's
   determination that a safe discharge location had not been secured;
   and

2. Blue Cross Blue Shield Association, as Appellant's carrier,
   immediately implement the Office of Personnel Management's

58

final and binding determination authorizing Long-Term Acute

Care benefits, as required by 5 U.S.C. § 8902(j).

Appellant further requests that all remaining issues, including the

ultimate merits of enforcement mechanisms, damages, and ancillary

statutory and constitutional claims, be remanded to the district court

with instructions for adjudication under the correct legal standards.

Equity does not require a medically fragile individual to endure

escalating medical danger while courts resolve unsettled legal

questions. Interim injunctive relief exists to prevent irreversible harm

and not to defer protection until it is no longer possible.

Date: December 23, 2025

Rhonda Lunsford, Esq.

*/s/ Rhonda Lunsford*
*Attorney for Appellant JOHN DOE[2]*

_____

[2]For the Court's awareness, Appellant's counsel is also his spouse and representative. This representation is in compliance with California Rule of Professional Conduct 3.7.

59

## ADDENDUM

## TABLE OF CONTENTS

### United States Code

5 U.S.C. § 8902(j) – Contract terms ...................................................2

### Code of Federal Regulations

42 C.F.R. § 405.1204 – Notifying beneficiaries of hospital discharge appeal rights ...................................................................8

42 C.F.R. § 482.43 – Condition of participation:

Discharge planning ..............................................................25

**5 USC 8902: Contracting authority**
Text contains those laws in effect on December 22, 2025

**From Title 5-GOVERNMENT ORGANIZATION AND EMPLOYEES**
    PART III-EMPLOYEES
    Subpart G-Insurance and Annuities
    CHAPTER 89-HEALTH INSURANCE
**Jump To:**
    <u>Source Credit</u>
    <u>Miscellaneous</u>
    <u>References In Text</u>
    <u>Codification</u>
    <u>Amendments</u>
    <u>Effective Date</u>

## §8902. Contracting authority

(a) The Office of Personnel Management may contract with qualified carriers offering plans described by section 8903 or 8903a of this title, without regard to section 6101(b) to (d) of title 41 or other statute requiring competitive bidding. Each contract shall be for a uniform term of at least 1 year, but may be made automatically renewable from term to term in the absence of notice of termination by either party.

(b) To be eligible as a carrier for the plan described by section 8903(2) of this title, a company must be licensed to issue group health insurance in all the States and the District of Columbia.

(c) A contract for a plan described by section 8903(1) or (2) of this title shall require the carrier-

(1) to reinsure with other companies which elect to participate, under an equitable formula based on the total amount of their group health insurance benefit payments in the United States during the latest year for which the information is available, to be determined by the carrier and approved by the Office; or

(2) to allocate its rights and obligations under the contract among its affiliates which elect to participate, under an equitable formula to be determined by the carrier and the affiliates and approved by the Office.

(d) Each contract under this chapter shall contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as the Office considers necessary or desirable.

(e) The Office may prescribe reasonable minimum standards for health benefits plans described by section 8903 or 8903a of this title and for carriers offering the plans. Approval of a plan may be withdrawn only after notice and opportunity for hearing to the carrier concerned without regard to subchapter II of chapter 5 and chapter 7 of this title. The Office may terminate the contract of a carrier effective at the end of the contract term, if the Office finds that at no time during the preceding two contract terms did the carrier have 300 or more employees and annuitants, exclusive of family members, enrolled in the plan.

(f) A contract may not be made or a plan approved which excludes an individual because of race, sex, health status, or, at the time of the first opportunity to enroll, because of age.

(g) A contract may not be made or a plan approved which does not offer to each employee, annuitant, family member, former spouse, or person having continued coverage under section 8905a of this title whose enrollment in the plan is ended, except by a cancellation of enrollment, a temporary extension of coverage during which he may exercise the option to convert, without evidence of good health, to a nongroup contract providing health benefits. An employee, annuitant, family member, former spouse, or person having continued coverage under section 8905a of this title who exercises this option shall pay the full periodic charges of the nongroup contract.

(h) The benefits and coverage made available under subsection (g) of this section are noncancelable by the carrier except for fraud, over-insurance, or nonpayment of periodic charges.

(i) Rates charged under health benefits plans described by section 8903 or 8903a of this title shall reasonably and equitably reflect the cost of the benefits provided. Rates under health benefits plans described by section 8903(1) and (2) of this title shall be determined on a basis which, in the judgment of the Office, is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers. The rates determined for the first contract term shall be continued for later contract terms, except that they may be readjusted for any later term, based on past experience and benefit adjustments under the later contract. Any readjustment in rates shall be made in advance of the contract term in which they will apply and on a basis which, in the judgment of the Office, is consistent with the general practice of carriers which issue group health benefit plans to large employers.

(j) Each contract under this chapter shall require the carrier to agree to pay for or provide a health service or supply in an individual case if the Office finds that the employee, annuitant, family member, former spouse, or person having continued coverage under section 8905a of this title is entitled thereto under the terms of the contract.

(k)(1) When a contract under this chapter requires payment or reimbursement for services which may be performed by a clinical psychologist, optometrist, nurse midwife, nursing school administered clinic, or nurse practitioner/clinical specialist, licensed or certified as such under Federal or State law, as applicable, or by a qualified clinical social worker

as defined in section 8901(11), an employee, annuitant, family member, former spouse, or person having continued coverage under section 8905a of this title covered by the contract shall be free to select, and shall have direct access to, such a clinical psychologist, qualified clinical social worker, optometrist, nurse midwife, nursing school administered clinic, or nurse practitioner/nurse clinical specialist without supervision or referral by another health practitioner and shall be entitled under the contract to have payment or reimbursement made to him or on his behalf for the services performed.

(2) Nothing in this subsection shall be considered to preclude a health benefits plan from providing direct access or direct payment or reimbursement to a provider in a health care practice or profession other than a practice or profession listed in paragraph (1), if such provider is licensed or certified as such under Federal or State law.

(3) The provisions of this subsection shall not apply to comprehensive medical plans as described in section 8903(4) of this title.

(l) The Office shall contract under this chapter for a plan described in section 8903(4) of this title with any qualified health maintenance carrier which offers such a plan. For the purpose of this subsection, "qualified health maintenance carrier" means any qualified carrier which is a qualified health maintenance organization within the meaning of section 1310(d)(1) [1] of title XIII of the Public Health Service Act (42 U.S.C. 300c–9(d)).

(m)(1) The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans.

(2)(A) Notwithstanding the provisions of paragraph (1) of this subsection, if a contract under this chapter provides for the provision of, the payment for, or the reimbursement of the cost of health services for the care and treatment of any particular health condition, the carrier shall provide, pay, or reimburse up to the limits of its contract for any such health service properly provided by any person licensed under State law to provide such service if such service is provided to an individual covered by such contract in a State where 25 percent or more of the population is located in primary medical care manpower shortage areas designated pursuant to section 332 of the Public Health Service Act (42 U.S.C. 254e).

(B) The provisions of subparagraph (A) shall not apply to contracts entered into providing prepayment plans described in section 8903(4) of this title.

(n) A contract for a plan described by section 8903(1), (2), or (3), or section 8903a, shall require the carrier-

(1) to implement hospitalization-cost-containment measures, such as measures-

(A) for verifying the medical necessity of any proposed treatment or surgery;

(B) for determining the feasibility or appropriateness of providing services on an outpatient rather than on an inpatient basis;

(C) for determining the appropriate length of stay (through concurrent review or otherwise) in cases involving inpatient care; and

(D) involving case management, if the circumstances so warrant; and

(2) to establish incentives to encourage compliance with measures under paragraph (1).

(o) A contract may not be made or a plan approved which includes coverage for any benefit, item, or service for which funds may not be used under the Assisted Suicide Funding Restriction Act of 1997.

(p) Each contract under this chapter shall require the carrier to comply with requirements described in the provisions of sections 2799A–1, 2799A–2, and 2799A–7 of the Public Health Service Act, sections 716, 717, and 722 of the Employee Retirement Income Security Act of 1974, and sections 9816, 9817, and 9822 of the Internal Revenue Code of 1986 (as applicable) in the same manner as such provisions apply to a group health plan or health insurance issuer offering group or individual health insurance coverage, as described in such sections. The provisions of sections 2799B–1, 2799B–2, 2799B–3, and 2799B–5 of the Public Health Service Act shall apply to a health care provider and facility and an air ambulance provider described in such respective sections with respect to an enrollee in a health benefits plan under this chapter in the same manner as such provisions apply to such a provider and facility with respect to an enrollee in a group health plan or group or individual health insurance coverage offered by a health insurance issuer, as described in such sections.

( Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 601 ; Pub. L. 93–246, §3, Jan. 31, 1974, 88 Stat. 4 ; Pub. L. 93–363, §1, July 30, 1974, 88 Stat. 398 ; Pub. L. 94–183, §2(43), Dec. 31, 1975, 89 Stat. 1059 ; Pub. L. 94–460, title I, §110(b), Oct. 8, 1976, 90 Stat. 1952 ; Pub. L. 95–368, §1, Sept. 17, 1978, 92 Stat. 606 ; Pub. L. 95–454, title IX, §906(a)(2), (3), Oct. 13, 1978, 92 Stat. 1224 ; Pub. L. 96–179, §3, Jan. 2, 1980, 93 Stat. 1299 ; Pub. L. 98–615, §3(2), Nov. 8, 1984, 98 Stat. 3203 ; Pub. L. 99–53, §2(a), June 17, 1985, 99 Stat. 94 ; Pub. L. 99–251, title I, §§105(b), 106(a)(3), Feb. 27, 1986, 100 Stat. 15 , 16; Pub. L. 100–202, §101(m) [title VI, §626], Dec. 22, 1987, 101 Stat. 1329–390 , 1329-430; Pub. L. 100–654, title II, §§201(b), 202(a), Nov. 14, 1988, 102 Stat. 3845 ; Pub. L. 101–508, title VII, §7002(a), Nov. 5, 1990, 104 Stat. 1388–329 ; Pub. L. 101–509, title IV, §1, Nov. 5, 1990, 104 Stat. 1421 ; Pub. L. 102–393, title V, §537(a), (b), Oct. 6, 1992, 106 Stat. 1765 ; Pub. L. 105–12, §9(g), Apr. 30, 1997, 111 Stat. 27 ; Pub. L. 105–266, §§3(c), 8, Oct. 19, 1998, 112 Stat. 2366 , 2370; Pub. L. 111–350, §5(a)(15), Jan. 4, 2011, 124 Stat. 3842 ; Pub. L. 116–260, div. BB, title I, §102(d)(1), Dec. 27, 2020, 134 Stat. 2797 .)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| | 5 U.S.C. 3005. | Sept. 28, 1959, Pub. L. 86–382, §6, 73 Stat. 712 . |
| | | Mar. 17, 1964, Pub. L. 88–284, §1(7)–(9), 78 Stat. 165 . |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### EDITORIAL NOTES

### REFERENCES IN TEXT

Section 1310(d)(1) of title XIII of the Public Health Service Act (42 U.S.C. 300c–9(d)), referred to in subsec. (l), probably is intended as a reference to section 300e–9(d) of Title 42, The Public Health and Welfare. Section 300e–9(d) of Title 42 was redesignated section 300e–9(c) of Title 42 by Pub. L. 100–517, §7(b), Oct. 24, 1988, 102 Stat. 2580 .

The Assisted Suicide Funding Restriction Act of 1997, referred to in subsec. (o), is Pub. L. 105–12, Apr. 30, 1997, 111 Stat. 23 , which is classified principally to chapter 138 (§14401 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 14401 of Title 42 and Tables.

Sections 2799A–1, 2799A–2, 2799A–7, 2799B–1, 2799B–2, 2799B–3, and 2799B–5 of the Public Health Service Act, referred to in subsec. (p), are classified to sections 300gg–111, 300gg–112, 300gg–117, 300gg–131, 300gg–132, 300gg–133, and 300gg–135, respectively, of Title 42, The Public Health and Welfare.

Sections 716, 717, and 722 of the Employee Retirement Income Security Act of 1974, referred to in subsec. (p), are classified to sections 1185e, 1185f, and 1185k, respectively, of Title 29, Labor.

Sections 9816, 9817, and 9822 of the Internal Revenue Code of 1986, referred to in subsec. (p), are classified to sections 9816, 9817, and 9822, respectively, of Title 26, Internal Revenue Code.

### CODIFICATION

Another section 1 of title IV of Pub. L. 101–509, 104 Stat. 1416 , enacted sections 2701 to 2706 of Title 44, Public Printing and Documents, and provisions set out as a note under section 2102 of Title 44.

### AMENDMENTS

**2020**-Subsec. (p). Pub. L. 116–260 added subsec. (p).

**2011**-Subsec. (a). Pub. L. 111–350 substituted "section 6101(b) to (d) of title 41" for "section 5 of title 41".

**1998**-Subsec. (k)(2), (3). Pub. L. 105–266, §8, added par. (2) and redesignated former par. (2) as (3).

Subsec. (m)(1). Pub. L. 105–266, §3(c), added par. (1) and struck out former par. (1) which read as follows: "The provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans to the extent that such law or regulation is inconsistent with such contractual provisions."

**1997**-Subsec. (o). Pub. L. 105–12 added subsec. (o).

**1992**-Pub. L. 102–393 amended subsec. (k) generally. Prior to amendment, subsec. (k) read as follows:

"(1) When a contract under this chapter requires payment or reimbursement for services which may be performed by a clinical psychologist, optometrist, nurse midwife, or nurse practitioner/clinical specialist, licensed or certified as such under Federal or State law, as applicable, or by a qualified clinical social worker as defined in section 8901(11), an employee, annuitant, family member, former spouse, or person having continued coverage under section 8905a of this title covered by the contract shall be free to select, and shall have direct access to, such a clinical psychologist, qualified clinical social worker, optometrist, nurse midwife, or nurse practitioner/nurse clinical specialist without supervision or referral by another health practitioner and shall be entitled under the contract to have payment or reimbursement made to him or on his behalf for the services performed.

"(2) The provisions of this subsection shall not apply to group practice prepayment plans."

**1990**-Subsec. (k)(1). Pub. L. 101–509 substituted "performed by a clinical psychologist, optometrist, nurse midwife, or nurse practitioner/clinical specialist" for "performed by a clinical psychologist or optometrist" and "qualified clinical social worker, optometrist, nurse midwife, or nurse practitioner/nurse clinical specialist" for "qualified clinical social worker, optometrist, or optometrist".

Subsec. (n). Pub. L. 101–508 added subsec. (n).

4

**1988**-Subsecs. (g), (j), (k)(1). Pub. L. 100–654 substituted "former spouse, or person having continued coverage under section 8905a of this title" for "or former spouse" wherever appearing.

**1987**-Subsec. (k)(1). Pub. L. 100–202, §101(m) [title VI, §626(1), (2)], inserted "or by a qualified clinical social worker as defined in section 8901(11)," after "as applicable," and ", qualified clinical social worker" after "such a clinical psychologist".

Subsec. (k)(2), (3). Pub. L. 100–202, §101(m) [title VI, §626(3)], redesignated par. (3) as (2) and struck out former par. (2) which read as follows: "When a contract under this chapter requires payment or reimbursement for services which may be performed by a qualified clinical social worker, an employee, annuitant, family member, or former spouse covered by the contract shall be entitled under the contract to have payment or reimbursement made to him or on his behalf for the services performed. As a condition for the payment or reimbursement, the contract-

"(A) may require that the services be performed pursuant to a referral by a psychiatrist; but

"(B) may not require that the services be performed under the supervision of a psychiatrist or other health practitioner."

Subsec. (m)(2)(A). Pub. L. 100–202, §101(m) [title VI, §626(4)], struck out "This paragraph shall apply with respect to a qualified clinical social worker covered by subsection (k)(2) of this section without regard to whether such contract contains the requirement authorized by clause (i) of the second sentence of subparagraph (A) of such subsection (k)(2)."

**1986**-Subsec. (k). Pub. L. 99–251, §105(b), designated existing provisions as par. (1), struck out last sentence providing that the provisions of this subsection shall not apply to group practice prepayment plans, and added pars. (2) and (3).

Subsec. (m)(2)(A). Pub. L. 99–251, §106(a)(3), inserted last sentence relating to applicability of this paragraph with respect to a qualified clinical social worker covered by subsection (k)(2) of this section.

**1985**-Subsecs. (a), (e), (i). Pub. L. 99–53 inserted reference to section 8903a of this title.

**1984**-Subsec. (g). Pub. L. 98–615, §3(2)(A), substituted "employee, annuitant, family member, or former spouse" for "employee or annuitant" in two places.

Subsecs. (j), (k). Pub. L. 98–615, §3(2)(B), substituted "family member, or former spouse" for "or family member".

**1980**-Subsec. (m)(2)(A). Pub. L. 96–179 substituted "in a State where 25 percent or more of the population is located in primary medical care manpower shortage areas designated pursuant to section 332 of the Public Health Service Act (42 U.S.C. 254e)" for "who is a member of a medically underserved population (within the meaning of section 1302(7) of the Public Health Service Act (42 U.S.C. 300e–17))".

**1978**-Subsecs. (a), (c) to (e), (i), (j), (l). Pub. L. 95–454 substituted "Office of Personnel Management" for "Civil Service Commission" and "Office" for "Commission" wherever appearing.

Subsec. (m). Pub. L. 95–368 added subsec. (m).

**1976**-Subsec. (l). Pub. L. 94–460 added subsec. (l).

**1975**-Subsecs. (j), (k). Pub. L. 94–183 redesignated subsec. (j), added by Pub. L. 93–363 and relating to services performed by a clinical psychologist or optometrist, as (k).

**1974**-Subsec. (j). Pub. L. 93–363 added subsec. (j) covering services performed by a clinical psychologist or optometrist.

Pub. L. 93–246 added subsec. (j) requiring the carrier to pay for or provide a health service or supply in specified cases.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2020 AMENDMENT

Pub. L. 116–260, div. BB, title I, §102(e), Dec. 27, 2020, 134 Stat. 2797 , provided that: "The amendments made by this section [enacting sections 9816 and 9822 of Title 26, Internal Revenue Code, sections 1185e and 1185k of Title 29, Labor, and sections 300gg–111 and 300gg–117 of Title 42, The Public Health and Welfare, and amending this section, section 223 of Title 26, and sections 300gg–19a, 300gg–21, 300gg–22, 300gg–23, and 18011 of Title 42] shall apply with respect to plan years (or, in the case of the amendment made by subsection (d)(1) [amending this section], with respect to contracts entered into or renewed for contract years) beginning on or after January 1, 2022."

### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–12 effective Apr. 30, 1997, and applicable to Federal payments made pursuant to obligations incurred after Apr. 30, 1997, for items and services provided on or after such date, subject to also being applicable with respect to contracts entered into, renewed, or extended after Apr. 30, 1997, as well as contracts entered into before Apr. 30, 1997, to the extent permitted under such contracts,

see section 11 of Pub. L. 105–12, set out as an Effective Date note under section 14401 of Title 42, The Public Health and Welfare.

### Effective Date of 1992 Amendment

Pub. L. 102–393, title V, §537(c), Oct. 6, 1992, 106 Stat. 1765 , provided that: "The amendments made by this section [amending this section] shall be effective with respect to contract years beginning after the date of enactment of this Act [Oct. 6, 1992]."

### Effective Date of 1990 Amendment

Pub. L. 101–508, title VII, §7002(g), Nov. 5, 1990, 104 Stat. 1388–331 , provided that: "Except as provided in subsection (f) [set out as a note under section 8904 of this title], the amendments made by this section [amending this section, sections 8904, 8909, and 8910 of this title, and provisions set out as a note under section 8906 of this title] shall apply with respect to contract years beginning on or after January 1, 1991."

### Effective Date of 1988 Amendment

Pub. L. 100–654, title II, §203, Nov. 14, 1988, 102 Stat. 3845 , provided that:

"(a) In General.-The amendments made by this title [enacting section 8905a of this title and amending this section and sections 8903, 8905, and 8909 of this title] shall apply with respect to-

"(1) any calendar year beginning, and contracts entered into or renewed for any calendar year beginning, after the end of the 9-month period beginning on the date of the enactment of this Act [Nov. 14, 1988]; and

"(2) any qualifying event occurring on or after the first day of the first calendar year beginning after the end of the 9-month period referred to in paragraph (1).

"(b) Definition.-For the purpose of this section, the term 'qualifying event' means any of the following events:

"(1) A separation from Government service.

"(2) A divorce, annulment, or legal separation.

"(3) Any change in circumstances which causes an individual to become ineligible to be considered an unmarried dependent child under chapter 89 of such title [section 8901 et seq. of this title]."

### Effective Date of 1986 Amendment

Amendment by section 105(b) of Pub. L. 99–251 effective with respect to contracts entered into or renewed for calendar years beginning after Dec. 31, 1986, see section 105(c) of Pub. L. 99–251, set out as a note under section 8901 of this title.

Pub. L. 99–251, title I, §106(b), Feb. 27, 1986, 100 Stat. 16 , provided that: "The amendments made by subsection (a) [amending this section and provisions set out as notes under this section] shall take effect with respect to services provided after December 31, 1984."

### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–615 effective May 7, 1985, with enumerated exceptions, and applicable to any individual who is married to an employee or annuitant on or after that date, see section 4(a)(2) of Pub. L. 98–615, as amended, set out as a note under section 8341 of this title.

### Effective Date of 1980 Amendment

Pub. L. 96–179, §5(b), Jan. 2, 1980, 93 Stat. 1300 , as amended by Pub. L. 99–251, title I, §106(a)(2), Feb. 27, 1986, 100 Stat. 16 , provided that: "The amendments made by section 3 [amending this section] shall apply to services provided after December 31, 1979, under any contract entered into or renewed after December 31, 1979."

### Effective Date of 1978 Amendments

Amendment by Pub. L. 95–454 effective 90 days after Oct. 13, 1978, see section 907 of Pub. L. 95–454, set out as a note under section 1101 of this title.

Pub. L. 95–368, §3, Sept. 17, 1978, 92 Stat. 606 , as amended by Pub. L. 99–251, title I, §106(a)(1), Feb. 27, 1986, 100 Stat. 16 , provided that: "The provisions of section 8902(m)(2) of title 5, United States Code, as added by the first section of this Act, shall apply to services provided under any contract entered into or renewed after December 31, 1979."

### Effective Date of 1976 Amendment

Amendment by Pub. L. 94–460 effective Oct. 8, 1976, see section 118 of Pub. L. 94–460, set out as a note under section 300e of Title 42, The Public Health and Welfare.

### Effective Date of 1974 Amendments

Pub. L. 93–363, §2, July 30, 1974, 88 Stat. 398 , provided that: "The amendment made by this Act [amending this section] shall become effective with respect to any contract entered into or renewed on or after the date of enactment of this Act [July 30, 1974]."

Pub. L. 93–246, §4(c), Jan. 31, 1974, 88 Stat. 4 , provided that: "Section 3 [amending this section] shall become effective with respect to any contract entered into or renewed on or after the date of enactment of this Act [Jan. 31, 1974]."

### Full Disclosure in Health Plan Contracts

Pub. L. 105–266, §5, Oct. 19, 1998, 112 Stat. 2368 , provided that: "The Office of Personnel Management shall encourage carriers offering health benefits plans described by section 8903 or section 8903a of title 5, United States Code, with respect to contractual arrangements made by such carriers with any person for purposes of obtaining discounts from providers for health care services or supplies furnished to individuals enrolled in such plan, to seek assurance that the conditions for such discounts are fully disclosed to the providers who grant them."

### Rate Reduction for Medicare Eligible Federal Annuitants

Pub. L. 100–360, title IV, §422, July 1, 1988, 102 Stat. 810 , which directed the Office of Personnel Management to reduce the rates charged medicare eligible individuals participating in health benefit plans by a prorated amount, was repealed by Pub. L. 101–234, title III, §301(a), Dec. 13, 1989, 103 Stat. 1985 .

### Authority of Carrier To Contract for Comprehensive Medical Services From a Group Practice Unit or Organization

Pub. L. 91–515, title IV, §401, Oct. 30, 1970, 84 Stat. 1309 , authorized Secretary of Health, Education, and Welfare to permit any carrier which is a party to a contract entered into under this chapter or under the Retired Federal Employees Health Benefits Act, or which participates in carrying out of any such contract, to issue in any State contracts entitling any person as a beneficiary to receive comprehensive medical services from a group practice unit or organization with which such carrier has contracted or otherwise arranged for the provision of such services.

[1] *See References in Text note below.*

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 73 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR Part 405 Subpart J (Dec. 19, 2025)

This content is from the eCFR and is authoritative but unofficial.

# Title 42 —Public Health

# Chapter IV —Centers for Medicare & Medicaid Services, Department of Health and Human Services

# Subchapter B —Medicare Program

# Part 405 —Federal Health Insurance for the Aged and Disabled

**Authority:** 42 U.S.C. 263a, 405(a), 1302, 1320b-12, 1395x, 1395y(a), 1395ff, 1395hh, 1395kk, 1395rr, and 1395ww(k).

**Subpart J** Procedures and Beneficiary Rights for Expedited Determinations and Reconsiderations When Coverage is Changed or Terminated

**§ 405.1200** Notifying beneficiaries of provider service terminations.

**§ 405.1202** Expedited determination procedures.

**§ 405.1204** Expedited reconsiderations.

**§ 405.1205** Notifying beneficiaries of hospital discharge appeal rights.

**§ 405.1206** Expedited determination procedures for inpatient hospital care.

**§ 405.1208** Hospital requests expedited QIO review.

**§ 405.1210** Notifying eligible beneficiaries of appeal rights when a beneficiary is reclassified from an inpatient to an outpatient receiving observation services.

**§ 405.1211** Expedited determination procedures when a beneficiary is reclassified from an inpatient to an outpatient receiving observation services.

**§ 405.1212** Expedited reconsideration procedures regarding Part A coverage when a beneficiary is reclassified from an inpatient to an outpatient receiving observation services.

## Subpart J—Procedures and Beneficiary Rights for Expedited Determinations and Reconsiderations When Coverage is Changed or Terminated

**Source:** 69 FR 69264, Nov. 26, 2004, unless otherwise noted.

## § 405.1200 Notifying beneficiaries of provider service terminations.

(a) *Applicability and scope.*

(1) For purposes of §§ 405.1200 through 405.1204, the term, provider, is defined as a home health agency (HHA), skilled nursing facility (SNF), comprehensive outpatient rehabilitation facility (CORF), or hospice.

(2) For purposes of §§ 405.1200 through 405.1204, a termination of Medicare-covered service is a discharge of a beneficiary from a residential provider of services, or a complete cessation of coverage at the end of a course of treatment prescribed in a discrete increment, regardless of

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 74 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1200(b)

whether the beneficiary agrees that the services should end. A termination does not include a reduction in services. A termination also does not include the termination of one type of service by the provider if the beneficiary continues to receive other Medicare-covered services from the provider.

(b) *Advance written notice of service terminations.* Before any termination of services, the provider of the service must deliver valid written notice to the beneficiary of the provider's decision to terminate services. The provider must use a standardized notice, as specified by CMS, in accordance with the following procedures:

(1) *Timing of notice.* A provider must notify the beneficiary of the decision to terminate covered services no later than 2 days before the proposed end of the services. If the beneficiary's services are expected to be fewer than 2 days in duration, the provider must notify the beneficiary at the time of admission to the provider. If, in a non-residential setting, the span of time between services exceeds 2 days, the notice must be given no later than the next to last time services are furnished.

(2) *Content of the notice.* The standardized termination notice must include the following information:

(i) The date that coverage of services ends;

(ii) The date that the beneficiary's financial liability for continued services begins;

(iii) A description of the beneficiary's right to an expedited determination under § 405.1202, including information about how to request an expedited determination and about a beneficiary's right to submit evidence showing that services must continue;

(iv) A beneficiary's right to receive the detailed information specified under § 405.1202(f); and

(v) Any other information required by CMS.

(3) *When delivery of the notice is valid.* Delivery of the termination notice is valid if—

(i) The beneficiary (or the beneficiary's authorized representative) has signed and dated the notice to indicate that he or she has received the notice and can comprehend its contents; and

(ii) The notice is delivered in accordance with paragraph (b)(1) of this section and contains all the elements described in paragraph (b)(2) of this section.

(4) *If a beneficiary refuses to sign the notice.* The provider may annotate its notice to indicate the refusal, and the date of refusal is considered the date of receipt of the notice.

(5) *Financial liability for failure to deliver valid notice.* A provider is financially liable for continued services until 2 days after the beneficiary receives valid notice as specified under paragraph (b)(3) of this section, or until the service termination date specified on the notice, whichever is later. A beneficiary may waive continuation of services if he or she agrees with being discharged sooner than the planned service termination date.

## § 405.1202 Expedited determination procedures.

(a) *Beneficiary's right to an expedited determination by the QIO.* A beneficiary has a right to an expedited determination by a QIO under the following circumstances:

(1) For services furnished by a non-residential provider, the beneficiary disagrees with the provider of those services that services should be terminated, and a physician certifies that failure to continue the provision of the service(s) may place the beneficiary's health at significant risk.

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 75 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)                                                    42 CFR 405.1202(a)(2)
Procedures and Beneficiary Rights for Expedited Determinations and...

   (2)  For services furnished by a residential provider or a hospice, the beneficiary disagrees with the provider's decision to discharge the beneficiary.

  (b)  *Requesting an expedited determination.*

   (1)  A beneficiary who wishes to exercise the right to an expedited determination must submit a request for a determination to the QIO in the State in which the beneficiary is receiving those provider services, in writing or by telephone, by no later than noon of the calendar day following receipt of the provider's notice of termination. If the QIO is unable to accept the beneficiary's request, the beneficiary must submit the request by noon of the next day the QIO is available to accept a request.

   (2)  The beneficiary, or his or her representative, must be available to answer questions or to supply information that the QIO may request to conduct its review.

   (3)  The beneficiary may, but is not required to, submit evidence to be considered by a QIO in making its decision.

   (4)  If a beneficiary makes an untimely request for an expedited determination by a QIO, the QIO will accept the request and make a determination as soon as possible, but the 72-hour time frame under paragraph (e)(6) and the financial liability protection under paragraph (g) of this section do not apply.

  (c)  *Coverage of provider services.* Coverage of provider services continues until the date and time designated on the termination notice, unless the QIO reverses the provider's service termination decision. If the QIO's decision is delayed because the provider did not timely supply necessary information or records, the provider may be liable for the costs of any additional coverage, as determined by the QIO in accordance with paragraph (e)(7) of this section. If the QIO finds that the beneficiary did not receive valid notice, coverage of provider services continues until at least 2 days after valid notice has been received. Continuation of coverage is not required if the QIO determines that coverage could pose a threat to the beneficiary's health or safety.

  (d)  *Burden of proof.* When a beneficiary requests an expedited determination by a QIO, the burden of proof rests with the provider to demonstrate that termination of coverage is the correct decision, either on the basis of medical necessity, or based on other Medicare coverage policies.

   (1)  In order for the QIO to determine whether the provider has met the burden of proof, the provider should supply any and all information that a QIO requires to sustain the provider's termination decision, consistent with paragraph (f) of this section.

   (2)  The beneficiary may submit evidence to be considered by a QIO in making its decision.

  (e)  *Procedures the QIO must follow.*

   (1)  On the day the QIO receives the request for an expedited determination under paragraph (b) of this section, it must immediately notify the provider of those services that a request for an expedited determination has been made.

   (2)  The QIO determines whether the provider delivered valid notice of the termination decision consistent with § 405.1200(b) and paragraph (f) of this section.

   (3)  The QIO examines the medical and other records that pertain to the services in dispute. If applicable, the QIO determines whether a physician has certified that failure to continue the provision of services may place the beneficiary's health at significant risk.

   (4)  The QIO must solicit the views of the beneficiary who requested the expedited determination.

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 76 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1202(e)(5)

(5) The QIO must provide an opportunity for the provider/practitioner to explain why the termination or discharge is appropriate.

(6) No later than 72 hours after receipt of the request for an expedited determination, the QIO must notify the beneficiary, beneficiary's physician, and the provider of services of its determination whether termination of Medicare coverage is the correct decision, either on the basis of medical necessity or based on other Medicare coverage policies.

(7) If the QIO does not receive the information needed to sustain a provider's decision to terminate services, it may make its determination based on the evidence at hand, or it may defer a decision until it receives the necessary information. If this delay results in extended Medicare coverage of an individual's provider services, the provider may be held financially liable for these services, as determined by the QIO.

(8) The QIO's initial notification may be by telephone, followed by a written notice including the following information:

    (i) The rationale for the determination;

    (ii) An explanation of the Medicare payment consequences of the determination and the date a beneficiary becomes fully liable for the services; and

    (iii) Information about the beneficiary's right to a reconsideration of the QIO's determination, including how to request a reconsideration and the time period for doing so.

(f) *Responsibilities of providers.*

(1) When a QIO notifies a provider that a beneficiary has requested an expedited determination, the provider must send a detailed notice to the beneficiary by close of business of the day of the QIO's notification. The detailed termination notice must include the following information:

    (i) A specific and detailed explanation why services are either no longer reasonable and necessary or are no longer covered;

    (ii) A description of any applicable Medicare coverage rule, instruction, or other Medicare policy, including citations to the applicable Medicare policy rules or information about how the beneficiary may obtain a copy of the Medicare policy;

    (iii) Facts specific to the beneficiary and relevant to the coverage determination that are sufficient to advise the beneficiary of the applicability of the coverage rule or policy to the beneficiary's case; and

    (iv) Any other information required by CMS.

(2) Upon notification by the QIO of the request for an expedited determination, the provider must supply all information that the QIO needs to make its expedited determination, including a copy of the notices required under § 405.1200(b) and under paragraph (f)(1) of this section. The provider must furnish this information as soon as possible, but no later than by close of business of the day the QIO notifies the provider of the request for an expedited determination. At the discretion of the QIO, the provider may make the information available by phone or in writing (with a written record of any information not transmitted initially in writing).

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 77 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1202(f)(3)

(3) At a beneficiary's request, the provider must furnish the beneficiary with a copy of, or access to, any documentation that it sends to the QIO including records of any information provided by telephone. The provider may charge the beneficiary a reasonable amount to cover the costs of duplicating the documentation and/or delivering it to the beneficiary. The provider must accommodate such a request by no later than close of business of the first day after the material is requested.

(g) *Coverage during QIO review.* When a beneficiary requests an expedited determination in accordance with the procedures required by this section, the provider may not bill the beneficiary for any disputed services until the expedited determination process (and reconsideration process, if applicable) has been completed.

## § 405.1204 Expedited reconsiderations.

(a) *Beneficiary's right to an expedited reconsideration.* A beneficiary who is dissatisfied with a QIO's expedited determination may request an expedited reconsideration by the appropriate QIC.

(b) *Requesting an expedited reconsideration.*

(1) A beneficiary who wishes to obtain an expedited reconsideration must submit a request for the reconsideration to the appropriate QIC, in writing or by telephone, by no later than noon of the calendar day following initial notification (whether by telephone or in writing) receipt of the QIO's determination. If the QIC is unable to accept the beneficiary's request, the beneficiary must submit the request by noon of the next day the QIC is available to accept a request.

(2) The beneficiary, or his or her representative, must be available to answer questions or supply information that the QIC may request to conduct its reconsideration.

(3) The beneficiary may, but is not required to, submit evidence to be considered by a QIC in making its decision.

(4) A beneficiary who does not file a timely request for an expedited QIC reconsideration subsequently may request a reconsideration under the standard claims appeal process, but the coverage protections described in paragraph (f) of this section would not extend through this reconsideration, nor would the timeframes or the escalation process described in paragraphs (c)(3) and (c)(5) of this section, respectively.

(c) *Procedures the QIC must follow.*

(1) On the day the QIC receives the request for an expedited determination under paragraph (b) of this section, the QIC must immediately notify the QIO that made the expedited determination and the provider of services of the request for an expedited reconsideration.

(2) The QIC must offer the beneficiary and the provider an opportunity to provide further information.

(3) Unless the beneficiary requests an extension in accordance with paragraph (c)(6) of this section, no later than 72 hours after receipt of the request for an expedited reconsideration, and any medical or other records needed for such reconsideration, the QIC must notify the QIO, the beneficiary, the beneficiary's physician, and the provider of services, of its decision on the reconsideration request.

(4) The QIC's initial notification may be done by telephone, followed by a written notice including:

(i) The rationale for the reconsideration decision;

(ii) An explanation of the Medicare payment consequences of the determination and the beneficiary's date of liability; and

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 78 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1204(c)(4)(iii)

      (iii) Information about the beneficiary's right to appeal the QIC's reconsideration decision to OMHA for an ALJ hearing in accordance with subpart I of this part, including how to request an appeal and the time period for doing so.

   (5) Unless the beneficiary requests an extension in accordance with paragraph (c)(6) of this section, if the QIC does not issue a decision within 72 hours of receipt of the request, the QIC must notify the beneficiary of his or her right to have the case escalated to OMHA for an ALJ hearing in accordance with subpart I of this part, if the amount remaining in controversy after the QIO determination meets the requirements for an ALJ hearing under § 405.1006.

   (6) A beneficiary requesting an expedited reconsideration under this section may request (either in writing or orally) that the QIC grant such additional time as the beneficiary specifies (not to exceed 14 days) for the reconsideration. If an extension is granted, the deadlines in paragraph (c)(3) of this section do not apply.

 (d) *Responsibilities of the QIO.*

   (1) When a QIC notifies a QIO that a beneficiary has requested an expedited reconsideration, the QIO must supply all information that the QIC needs to make its expedited reconsideration as soon as possible, but no later than by close of business of the day that the QIC notifies the QIO of the request for an expedited reconsideration.

   (2) At a beneficiary's request, the QIO must furnish the beneficiary with a copy of, or access to, any documentation that it sends to the QIC. The QIO may charge the beneficiary a reasonable amount to cover the costs of duplicating the documentation and/or delivering it to the beneficiary. The QIO must accommodate the request by no later than close of business of the first day after the material is requested.

 (e) *Responsibilities of the provider.* A provider may, but is not required to, submit evidence to be considered by a QIC in making its decision. If a provider fails to comply with a QIC's request for additional information beyond that furnished to the QIO for purposes of the expedited determination, the QIC makes its reconsideration decision based on the information available.

 (f) *Coverage during QIC reconsideration process.* When a beneficiary requests an expedited reconsideration in accordance with the deadline specified in (b)(1) of this section, the provider may not bill the beneficiary for any disputed services until the QIC makes its determination.

*[69 FR 69624, Nov. 26, 2004, as amended at 82 FR 5124, Jan. 17, 2017]*

## § 405.1205 Notifying beneficiaries of hospital discharge appeal rights.

 (a) *Applicability and scope.*

   (1) For purposes of §§ 405.1204, 405.1205, 405.1206, and 405.1208, the term "hospital" is defined as any facility providing care at the inpatient hospital level, whether that care is short term or long term, acute or non acute, paid through a prospective payment system or other reimbursement basis, limited to specialty care or providing a broader spectrum of services. This definition includes critical access hospitals.

   (2) For purposes of §§ 405.1204, 405.1205, 405.1206, and 405.1208, a discharge is a formal release of a beneficiary from an inpatient hospital.

13

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 79 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1205(b)

(b) *Advance written notice of hospital discharge rights.* For all Medicare beneficiaries, hospitals must deliver valid, written notice of a beneficiary's rights as a hospital inpatient, including discharge appeal rights. The hospital must use a standardized notice, as specified by CMS, in accordance with the following procedures:

(1) *Timing of notice.* The hospital must provide the notice at or near admission, but no later than 2 calendar days following the beneficiary's admission to the hospital.

(2) *Content of the notice.* The notice must include the following information:

(i) The beneficiary's rights as a hospital inpatient including the right to benefits for inpatient services and for post-hospital services in accordance with 1866(a)(1)(M) of the Act.

(ii) The beneficiary's right to request an expedited determination of the discharge decision including a description of the process under § 405.1206, and the availability of other appeals processes if the beneficiary fails to meet the deadline for an expedited determination.

(iii) The circumstances under which a beneficiary will or will not be liable for charges for continued stay in the hospital in accordance with 1866(a)(1)(M) of the Act.

(iv) A beneficiary's right to receive additional detailed information in accordance with § 405.1206(e).

(v) Any other information required by CMS.

(3) *When delivery of the notice is valid.* Delivery of the written notice of rights described in this section is valid if—

(i) The beneficiary (or the beneficiary's representative) has signed and dated the notice to indicate that he or she has received the notice and can comprehend its contents, except as provided in paragraph (b)(4) of this section; and

(ii) The notice is delivered in accordance with paragraph (b)(1) of this section and contains all the elements described in paragraph (b)(2) of this section.

(4) *If a beneficiary refuses to sign the notice.* The hospital may annotate its notice to indicate the refusal, and the date of refusal is considered the date of receipt of the notice.

(c) *Follow up notification.*

(1) The hospital must present a copy of the signed notice described in paragraph (b)(2) of this section to the beneficiary (or beneficiary's representative) prior to discharge. The notice should be given as far in advance of discharge as possible, but not more than 2 calendar days before discharge.

(2) Follow up notification is not required if the notice required under § 405.1205(b) is delivered within 2 calendar days of discharge.

*[71 FR 68720, Nov. 27, 2006]*

## § 405.1206 Expedited determination procedures for inpatient hospital care.

(a) *Beneficiary's right to an expedited determination by the QIO.* A beneficiary has a right to request an expedited determination by the QIO when a hospital (acting directly or through its utilization review committee), with physician concurrence, determines that inpatient care is no longer necessary.

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 80 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1206(b)

(b)  *Requesting an expedited determination.*

    (1)  A beneficiary who wishes to exercise the right to an expedited determination must submit a request to the QIO that has an agreement with the hospital as specified in § 476.78 of this chapter. The request must be made no later than the day of discharge and may be in writing or by telephone.

    (2)  The beneficiary, or his or her representative, upon request by the QIO, must be available to discuss the case.

    (3)  The beneficiary may, but is not required to, submit written evidence to be considered by a QIO in making its decision.

    (4)  A beneficiary who makes a timely request for an expedited QIO review in accordance with paragraph (b)(1) of this section is subject to the financial liability protections under paragraphs (f)(1) and (f)(2) of this section, as applicable.

    (5)  A beneficiary who fails to make a timely request for an expedited determination by a QIO, as described in paragraph (b)(1) of this section, and remains in the hospital without coverage, still may request an expedited QIO determination at any time during the hospitalization. The QIO will issue a decision in accordance with paragraph (d)(6)(ii) of this section, however, the financial liability protection under paragraphs (f)(1) and (f)(2) of this section does not apply.

    (6)  A beneficiary who fails to make a timely request for an expedited determination in accordance with paragraph (b)(1) of this section, and who is no longer an inpatient in the hospital, may request QIO review within 30 calendar days after the date of discharge, or at any time for good cause. The QIO will issue a decision in accordance with paragraph (d)(6)(iii) of this section; however, the financial liability protection under paragraphs (f)(1) and (f)(2) of this section does not apply.

(c)  *Burden of proof.* When a beneficiary (or his or her representative, if applicable) requests an expedited determination by a QIO, the burden of proof rests with the hospital to demonstrate that discharge is the correct decision, either on the basis of medical necessity, or based on other Medicare coverage policies. Consistent with paragraph (e)(2) of this section, the hospital should supply any and all information that a QIO requires to sustain the hospital's discharge determination.

(d)  *Procedures the QIO must follow.*

    (1)  When the QIO receives the request for an expedited determination under paragraph (b)(1) of this section, it must immediately notify the hospital that a request for an expedited determination has been made.

    (2)  The QIO determines whether the hospital delivered valid notice consistent with § 405.1205(b)(3).

    (3)  The QIO examines the medical and other records that pertain to the services in dispute.

    (4)  The QIO must solicit the views of the beneficiary (or the beneficiary's representative) who requested the expedited determination.

    (5)  The QIO must provide an opportunity for the hospital to explain why the discharge is appropriate.

    (6)

        (i)  When the beneficiary requests an expedited determination in accordance with paragraph (b)(1) of this section, the QIO must make a determination and notify the beneficiary, the hospital, and physician of its determination within one calendar day after it receives all requested pertinent information.

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 81 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1206(d)(6)(ii)

(ii) When the beneficiary makes an untimely request for an expedited determination, and remains in the hospital, consistent with paragraph (b)(5) of this section, the QIO will make a determination and notify the beneficiary, the hospital, and the physician of its determination within 2 calendar days following receipt of the request and pertinent information.

(iii) When the beneficiary makes an untimely request for an expedited determination, and is no longer an inpatient in the hospital, consistent with paragraph (b)(6) of this section, the QIO will make a determination and notify the beneficiary, the hospital, and physician of its determination within 30 calendar days after receipt of the request and pertinent information.

(7) If the QIO does not receive the information needed to sustain a hospital's decision to discharge, it may make its determination based on the evidence at hand, or it may defer a decision until it receives the necessary information. If this delay results in extended Medicare coverage of an individual's hospital services, the hospital may be held financially liable for these services, as determined by the QIO.

(8) When the QIO issues an expedited determination, the QIO must notify the beneficiary, the physician, and hospital of its decision by telephone, followed by a written notice that must include the following information:

(i) The basis for the determination.

(ii) A detailed rationale for the determination.

(iii) An explanation of the Medicare payment consequences of the determination and the date a beneficiary becomes fully liable for the services.

(iv) Information about the beneficiary's right to a reconsideration of the QIO's determination as set forth in § 405.1204, including how to request a reconsideration and the time period for doing so.

(e) *Responsibilities of hospitals.*

(1) When a QIO notifies a hospital that a beneficiary has requested an expedited determination, the hospital must deliver a detailed notice to the beneficiary as soon as possible but no later than noon of the day after the QIO's notification. The detailed notice must include the following information:

(i) A detailed explanation why services are either no longer reasonable and necessary or are otherwise no longer covered.

(ii) A description of any applicable Medicare coverage rule, instruction, or other Medicare policy, including information about how the beneficiary may obtain a copy of the Medicare policy.

(iii) Facts specific to the beneficiary and relevant to the coverage determination that are sufficient to advise the beneficiary of the applicability of the coverage rule or policy to the beneficiary's case.

(iv) Any other information required by CMS.

(2) Upon notification by the QIO of the request for an expedited determination, the hospital must supply all information that the QIO needs to make its expedited determination, including a copy of the notices required as specified in § 405.1205 (b) and (c) and paragraph (e)(1) of this section. The hospital must furnish this information as soon as possible, but no later than by noon of the day after

16

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 82 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1206(e)(3)

the QIO notifies the hospital of the request for an expedited determination. At the discretion of the QIO, the hospital must make the information available by phone or in writing (with a written record of any information not transmitted initially in writing).

(3) At a beneficiary's (or representative's) request, the hospital must furnish the beneficiary with a copy of, or access to, any documentation that it sends to the QIO, including written records of any information provided by telephone. The hospital may charge the beneficiary a reasonable amount to cover the costs of duplicating the documentation and/or delivering it to the beneficiary. The hospital must accommodate such a request by no later than close of business of the first day after the material is requested.

(f) *Coverage during QIO expedited review* —

(1) *General rule and liability while QIO review is pending.* If the beneficiary remains in the hospital past midnight of the discharge date ordered by the physician, and the hospital, the physician who concurred with the discharge determination, or the QIO subsequently finds that the beneficiary requires inpatient hospital care, the beneficiary is not financially responsible for continued care (other than applicable coinsurance and deductible) until the hospital once again determines that the beneficiary no longer requires inpatient care, secures concurrence from the physician responsible for the beneficiary's care or the QIO, and notifies the beneficiary with a notice consistent with 405.1205 (c).

(2) *Timely filing and limitation on liability.* If a beneficiary files a request for an expedited determination by the QIO in accordance with paragraph (b)(1) of this section, the beneficiary is not financially responsible for inpatient hospital services (other than applicable coinsurance and deductible) furnished before noon of the calendar day after the date the beneficiary (or his or her representative) receives notification (either orally or in writing) of the expedited determination by the QIO.

(3) *Untimely request and liability.* When a beneficiary does not file a request for an expedited determination by the QIO in accordance with paragraph (b) of this section, but remains in the hospital past the discharge date, that beneficiary may be held responsible for charges incurred after the date of discharge or as otherwise stated by the QIO.

(4) *Hospital requests an expedited review.* When the hospital requests a review in accordance with § 405.1208, and the QIO concurs with the hospital's discharge determination, a hospital may not charge the beneficiary until the date specified by the QIO.

(g) *Effect of an expedited QIO determination.* The QIO determination is binding upon the beneficiary, physician, and hospital, except in the following circumstances:

(1) *Right to request a reconsideration.* If the beneficiary is still an inpatient in the hospital and is dissatisfied with the determination, he or she may request a reconsideration according to the procedures described in § 405.1204.

(2) *Right to pursue the general claims appeal process.* If the beneficiary is no longer an inpatient in the hospital and is dissatisfied with this determination, the determination is subject to the general claims appeal process.

*[71 FR 68721, Nov. 27, 2006]*

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 83 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1208

## § 405.1208 Hospital requests expedited QIO review.

(a) *General rule.*

   (1) If the hospital (acting directly or through its utilization review committee) believes that the beneficiary does not require further inpatient hospital care but is unable to obtain the agreement of the physician, it may request an expedited determination by the QIO.

   (2) When the hospital requests review, and the QIO concurs with the hospital's discharge determination, a hospital may not charge a beneficiary until the date specified by the QIO in accordance with 405.1206(f)(4).

(b) *Procedures hospital must follow.*

   (1) The hospital must (acting directly or through its utilization review committee) notify the beneficiary (or his or her representative) that it has requested that review.

   (2) The hospital must supply any pertinent information the QIO requires to conduct its review and must make it available by phone or in writing, by close of business of the first full working day immediately following the day the hospital submits the request for review.

(c) *Procedures the QIO must follow.*

   (1) The QIO must notify the hospital that it has received the request for review and must notify the hospital if it has not received all pertinent records.

   (2) The QIO must examine the pertinent records pertaining to the services.

   (3) The QIO must solicit the views of the beneficiary in question.

   (4) The QIO must make a determination and notify the beneficiary, the hospital, and physician within 2 working days of the hospital's request and receipt of any pertinent information submitted by the hospital.

(d) *Notice of an expedited determination.*

   (1) When a QIO issues an expedited determination as stated in paragraph (c)(4) of this section, it must notify the beneficiary, physician, and hospital of its decision, by telephone and subsequently in writing.

   (2) A written notice of the expedited initial determination must contain the following:

      (i) The basis for the determination;.

      (ii) A detailed rationale for the determination;

      (iii) A statement explaining the Medicare payment consequences of the expedited determination and date of liability, if any; and

      (iv) A statement informing the beneficiary of his or her appeal rights and the timeframe for requesting an appeal.

(e) *Effect of an expedited determination.* The expedited determination under this section is binding upon the beneficiary, physician, and hospital, except in the following circumstances:

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 84 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1208(e)(1)

(1) *When a beneficiary remains in the hospital.* If the beneficiary is still an inpatient in the hospital and is dissatisfied with this determination, he or she may request a reconsideration according to the procedures described in § 405.1204. The procedures described in § 405.1204 will apply to reconsiderations requested under this section. If the beneficiary does not make a request in accordance with § 405.1204(b)(1), the timeframes described in § 405.1204(c)(3), the escalation procedures described in § 405.1204(c)(5), and the coverage rule described in § 405.1204(f) will not apply.

(2) *When a beneficiary is no longer an inpatient in the hospital.* If the beneficiary is no longer an inpatient in the hospital and is dissatisfied with this determination, this determination is subject to the general claims appeal process.

[69 FR 69624, Nov. 26, 2004, as amended at 71 FR 68722, Nov. 27, 2006]

## § 405.1210 Notifying eligible beneficiaries of appeal rights when a beneficiary is reclassified from an inpatient to an outpatient receiving observation services.

(a) *Applicability and scope.*

(1) For purposes of this section and §§ 405.1211 and 405.1212, the term "hospital" is defined as any facility providing care at the inpatient hospital level, whether that care is short term or long term, acute or non-acute, paid through a prospective payment system or other reimbursement basis, limited to specialty care or providing a broader spectrum of services. This definition includes critical access hospitals (CAHs).

(2) For purposes of this section and §§ 405.1211 and 405.1212, the change in status occurs when a beneficiary is reclassified from an inpatient to an outpatient receiving observation services (as defined in § 405.931(h)).

(3) For purposes of this section and §§ 405.1211 and 405.1212, a beneficiary is eligible to pursue an appeal regarding a change in status when the beneficiary meets all the following:

(i) Was formally admitted as a hospital inpatient in accordance with an order for inpatient admission by a physician or other qualified practitioner.

(ii) Was subsequently reclassified by the hospital as an outpatient receiving observation services after the admission.

(iii)

(A) Was not enrolled in Part B coverage at the time of the beneficiary's hospitalization; or

(B) Stayed at the hospital for 3 or more consecutive days but was classified as an inpatient for fewer than 3 days.

(iv) The period "3 or more consecutive days" is counted using the rules for determining coverage of SNF services under section 1861 of the Act and § 409.30 of this chapter (that is, a beneficiary must have a qualifying inpatient stay of at least 3 consecutive calendar days starting with the admission day but not counting the discharge day).

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 85 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1210(b)

(b) *Advance written notice of appeal rights.* For all eligible beneficiaries, hospitals must deliver valid, written notice of an eligible beneficiary's right to pursue an appeal regarding the decision to reclassify the beneficiary from an inpatient to an outpatient receiving observation services. The hospital must use a standardized notice specified by CMS in accordance with the following procedures:

(1) *Timing of notice.* The hospital must provide the notice not later than 4 hours before release from the hospital and as soon as possible after the earliest of either of the following:

(i) The hospital reclassifies the beneficiary from an inpatient to an outpatient receiving observation services and the beneficiary is not enrolled in Part B.

(ii) The hospital reclassifies the beneficiary from an inpatient to an outpatient receiving observation services and the beneficiary has stayed in the hospital for 3 or more consecutive days but was an inpatient for fewer than 3 days.

(2) *Content of the notice.* The notice must include the following information:

(i) The eligible beneficiary's change in status and the appeal rights under § 405.1211 if the beneficiary wishes to pursue an appeal regarding that change.

(ii) An explanation of the implications of the change in status, including the potential change in beneficiary hospital charges resulting from a favorable decision, and subsequent eligibility for Medicare coverage for SNF services.

(iii) Any other information required by CMS.

(3) *When delivery of the notice is valid.* Delivery of the written notice of appeal rights described in this section is valid if—

(i) The eligible beneficiary (or the eligible beneficiary's representative) has signed and dated the notice to indicate that he or she has received the notice and can comprehend its contents, except as provided in paragraph (b)(4) of this section; and

(ii) The notice is delivered in accordance with paragraph (b)(1) of this section and contains all the elements described in paragraph (b)(2) of this section.

(4) *If an eligible beneficiary refuses to sign the notice.* The hospital may annotate its notice to indicate the refusal, and the date of refusal is considered the date of receipt of the notice.

[89 FR 83292, Oct. 15, 2024, as amended at 90 FR 20808, May 16, 2025]

**Editorial Notes:** 1. At 89 FR 83292, Oct. 15, 2024, § 405.1210 was added, with incorrect paragraph designations for the two subparagraphs in (b)(3).

2. At 89 FR 106364, Dec. 30, 2024, § 405.1210 was amended by adding paragraph (b)(3); however, the amendment could not be incorporated due to inaccurate amendatory instruction.

## § 405.1211 Expedited determination procedures when a beneficiary is reclassified from an inpatient to an outpatient receiving observation services.

(a) *Beneficiary's right to an expedited determination by the QIO.* An eligible beneficiary has a right to request an expedited determination by the QIO when—

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 86 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)                                                   42 CFR 405.1211(a)(1)
Procedures and Beneficiary Rights for Expedited Determinations and...

(1) A hospital changes a beneficiary's status from an inpatient to an outpatient receiving observation services; and

(2) The beneficiary meets other eligibility criteria as specified in § 405.1210(a)(3).

(b) *Requesting an expedited determination.*

(1) An eligible beneficiary who wishes to exercise the right to an expedited determination must submit a request to the QIO that has an agreement with the hospital as specified in § 476.78 of this chapter. The request must be made in writing or by telephone before release from the hospital.

(2) The eligible beneficiary, or his or her representative, upon request by the QIO, must be available to discuss the case.

(3) The eligible beneficiary may, but is not required to, submit written evidence to be considered by the QIO in making its decision.

(4) An eligible beneficiary who makes a timely request for an expedited QIO review in accordance with paragraph (b)(1) of this section is subject to the billing protection under paragraph (e) of this section, as applicable.

(5) An eligible beneficiary who fails to make a timely request for an expedited determination by a QIO, as described in paragraph (b)(1) of this section, may still request an untimely expedited QIO determination at any time. The QIO issues a decision in accordance with paragraph (c)(6)(ii) of this section, but the billing protection under paragraph (e) of this section does not apply.

(c) *Procedures the QIO must follow.*

(1) When the QIO receives the request for an expedited determination under paragraph (b)(1) of this section, it must immediately notify the hospital that a request for an expedited determination has been made.

(2) The QIO determines whether the hospital delivered valid notice consistent with § 405.1210(b)(3).

(3) The QIO examines the medical and other records that pertain to the change in status.

(4) The QIO must solicit the views of the eligible beneficiary (or the eligible beneficiary's representative) who requested the expedited determination.

(5) The QIO must provide an opportunity for the hospital to explain why the reclassification of the beneficiary from an inpatient to an outpatient receiving observation services is appropriate.

(6) The following timeframes apply for the QIO's decision when an eligible beneficiary requests—

  (i) A timely expedited determination in accordance with paragraph (b)(1) of this section, the QIO must make a determination within 1 calendar day of receiving all requested pertinent information specified in paragraph (d)(1)(i) of this section; or

  (ii) An untimely request for a QIO expedited determination, the QIO must make a determination within 2 calendar days after the QIO receives all requested information specified in paragraph (d)(1)(i) of this section.

(7) If the QIO does not receive the information specified in paragraph (d)(1)(i) of this section, it may make its determination based on the evidence at hand, or it may defer a decision until it receives the requested information.

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 87 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1211(c)(8)

(8) When the QIO issues an expedited determination, the QIO must notify the eligible beneficiary, the hospital, and SNF (if applicable) of its decision by telephone, followed by a written notice that must include the following information:

  (i) The basis for the determination.

  (ii) A detailed rationale for the determination.

  (iii) An explanation of the Medicare payment consequences of the determination.

  (iv) Information about the eligible beneficiary's right to an expedited reconsideration of the QIO's determination as set forth in § 405.1212, including how to request a reconsideration and the time period for doing so.

(d) *Responsibilities of hospitals.*

  (1)

  (i) Upon notification by the QIO of the request for an expedited determination, the hospital must supply all information that the QIO needs to make its expedited determination, including a copy of the notice as required in § 405.1210(b) of this section.

  (ii) The hospital must furnish this information as soon as possible, but no later than by noon of the calendar day after the QIO notifies the hospital of the request for an expedited determination.

  (iii) At the discretion of the QIO, the hospital must make the information available by phone or in writing (with a written record of any information not transmitted initially in writing).

  (2)

  (i) At an eligible beneficiary's (or representative's) request, the hospital must furnish the beneficiary with a copy of, or access to, any documentation that it sends to the QIO, including written records of any information provided by telephone.

  (ii) The hospital may charge the beneficiary a reasonable amount to cover the costs of duplicating the documentation and, if applicable, delivering it to the beneficiary.

  (iii) The hospital must accommodate such a request by no later than close of business of the first calendar day after the material is requested.

(e) *Billing during QIO expedited review.* When an eligible beneficiary requests an expedited determination in accordance with paragraphs (b)(1) through (b)(4) of this section, the hospital may not bill the beneficiary for any disputed services until the expedited determination process (and reconsideration process, if applicable) has been completed.

(f) *Effect of an expedited QIO determination.* The QIO determination is binding for payment purposes upon the eligible beneficiary, hospital, and MAC, except if the eligible beneficiary is dissatisfied with the determination, he or she may request a reconsideration according to the procedures described in § 405.1212.

*[89 FR 83292, Oct. 15, 2024]*

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 88 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1212

## § 405.1212 Expedited reconsideration procedures regarding Part A coverage when a beneficiary is reclassified from an inpatient to an outpatient receiving observation services.

(a) *Beneficiary's right to an expedited reconsideration.* An eligible beneficiary who is dissatisfied with a QIO's expedited determination per § 405.1211(c)(6) may request an expedited reconsideration by the QIO identified in the written notice specified in § 405.1211(c)(8)(iv).

(b) *Requesting an expedited reconsideration.*

(1) An eligible beneficiary who wishes to obtain an expedited reconsideration must submit a request for the reconsideration to the appropriate QIO, in writing or by telephone, by no later than noon of the calendar day following initial notification (whether by telephone or in writing) after receipt of the QIO's determination.

(2) The eligible beneficiary, or his or her representative, must be available to answer questions or supply information that the QIO may request to conduct its reconsideration.

(3) The eligible beneficiary may, but is not required to, submit evidence to be considered by the QIO in making the reconsideration.

(4) An eligible beneficiary who makes a timely request for an expedited reconsideration in accordance with paragraph (b)(1) of this section is subject to the billing protection under paragraph (e) of this section, as applicable.

(5) An eligible beneficiary who fails to make a timely request for an expedited reconsideration by a QIO, as described in paragraph (b)(1) of this section, may still request an expedited QIO reconsideration at any time. The QIO issues a reconsideration in accordance with paragraph (c)(3)(ii) of this section, but the billing protection under paragraph (e) of this section does not apply.

(c) *Procedures and responsibilities of the QIO.*

(1) On the day the QIO receives the request for an expedited reconsideration under paragraph (b) of this section, the QIO must immediately notify the hospital of the request for an expedited reconsideration.

(2) The QIO must offer the eligible beneficiary and the hospital an opportunity to provide further information.

(3) When the eligible beneficiary makes—

(i) A timely request in accordance with paragraph (b)(1) of this section, the QIO must make a reconsideration determination within 2 calendar days of receiving all requested pertinent information; or

(ii) An untimely request, the QIO must make a reconsideration determination within 3 calendar days of receiving all requested pertinent information.

(4) When the QIO issues a reconsideration determination, the QIO must notify the eligible beneficiary, the hospital, and SNF, if applicable, of its decision by telephone, followed by a written notice that must include the following information:

(i) The basis for the determination.

(ii) A detailed rationale for the determination.

Case: 25-7438, 12/23/2025, DktEntry: 8.1, Page 89 of 95

42 CFR Part 405 Subpart J (up to date as of 12/19/2025)
Procedures and Beneficiary Rights for Expedited Determinations and...

42 CFR 405.1212(c)(4)(iii)

(iii) An explanation of the Medicare payment consequences of the determination.

(iv) Information about the eligible beneficiary's right to appeal the QIO's reconsideration decision to OMHA for an ALJ hearing in accordance with subpart I of this part, including how to request an appeal and the time period for doing so.

(d) *Responsibilities of the hospital.* A hospital may, but is not required to, submit evidence to be considered by a QIO in making its reconsideration decision. If a hospital fails to comply with a QIO's request for additional information beyond that furnished to the QIO for purposes of the expedited determination, the QIO makes its reconsideration decision based on the information available.

(e) *Billing during QIO reconsideration.* When an eligible beneficiary requests an expedited reconsideration in accordance with the deadline specified in paragraph (b)(1) of this section, the hospital may not bill the beneficiary for any disputed services until the QIO makes its reconsideration decision.

(f) *Effect of an expedited QIO reconsideration.* The QIO expedited reconsideration is binding for payment purposes only, upon the eligible beneficiary, hospital, and MAC, except if a beneficiary elects to request a hearing by an ALJ in accordance with 42 CFR part 478 subpart B if he or she is dissatisfied with the expedited reconsideration decision.

*[89 FR 83292, Oct. 15, 2024]*

24

42 CFR 482.43 (up to date as of 12/19/2025)
Condition of participation: Discharge planning.

42 CFR 482.43 (Dec. 19, 2025)

This content is from the eCFR and is authoritative but unofficial.

# Title 42 —Public Health

## Chapter IV —Centers for Medicare & Medicaid Services, Department of Health and Human Services

### Subchapter G —Standards and Certification

### Part 482 —Conditions of Participation for Hospitals

### Subpart C —Basic Hospital Functions

**Authority:** 42 U.S.C. 1302, 1395hh, and 1395rr, unless otherwise noted.

**Source:** 51 FR 22042, June 17, 1986, unless otherwise noted.

## § 482.43 Condition of participation: Discharge planning.

The hospital must have an effective discharge planning process that focuses on the patient's goals and treatment preferences and includes the patient and his or her caregivers/support person(s) as active partners in the discharge planning for post-discharge care. The discharge planning process and the discharge plan must be consistent with the patient's goals for care and his or her treatment preferences, ensure an effective transition of the patient from hospital to post-discharge care, and reduce the factors leading to preventable hospital readmissions.

(a) *Standard: Discharge planning process.* The hospital's discharge planning process must identify, at an early stage of hospitalization, those patients who are likely to suffer adverse health consequences upon discharge in the absence of adequate discharge planning and must provide a discharge planning evaluation for those patients so identified as well as for other patients upon the request of the patient, patient's representative, or patient's physician.

(1) Any discharge planning evaluation must be made on a timely basis to ensure that appropriate arrangements for post-hospital care will be made before discharge and to avoid unnecessary delays in discharge.

(2) A discharge planning evaluation must include an evaluation of a patient's likely need for appropriate post-hospital services, including, but not limited to, hospice care services, post-hospital extended care services, home health services, and non-health care services and community based care providers, and must also include a determination of the availability of the appropriate services as well as of the patient's access to those services.

(3) The discharge planning evaluation must be included in the patient's medical record for use in establishing an appropriate discharge plan and the results of the evaluation must be discussed with the patient (or the patient's representative).

(4) Upon the request of a patient's physician, the hospital must arrange for the development and initial implementation of a discharge plan for the patient.

(5) Any discharge planning evaluation or discharge plan required under this paragraph must be developed by, or under the supervision of, a registered nurse, social worker, or other appropriately qualified personnel.

(6) The hospital's discharge planning process must require regular re-evaluation of the patient's condition to identify changes that require modification of the discharge plan. The discharge plan must be updated, as needed, to reflect these changes.

42 CFR 482.43 (up to date as of 12/19/2025)
Condition of participation: Discharge planning.

42 CFR 482.43(a)(7)

(7) The hospital must assess its discharge planning process on a regular basis. The assessment must include ongoing, periodic review of a representative sample of discharge plans, including those patients who were readmitted within 30 days of a previous admission, to ensure that the plans are responsive to patient post-discharge needs.

(8) The hospital must assist patients, their families, or the patient's representative in selecting a post-acute care provider by using and sharing data that includes, but is not limited to, HHA, SNF, IRF, or LTCH data on quality measures and data on resource use measures. The hospital must ensure that the post-acute care data on quality measures and data on resource use measures is relevant and applicable to the patient's goals of care and treatment preferences.

(b) *Standard: Discharge of the patient and provision and transmission of the patient's necessary medical information.* The hospital must discharge the patient, and also transfer or refer the patient where applicable, along with all necessary medical information pertaining to the patient's current course of illness and treatment, post-discharge goals of care, and treatment preferences, at the time of discharge, to the appropriate post-acute care service providers and suppliers, facilities, agencies, and other outpatient service providers and practitioners responsible for the patient's follow-up or ancillary care.

(c) *Standard: Transfer protocols.* Effective July 1, 2025, the hospital must have written policies and procedures for transferring patients under its care (inclusive of inpatient services) to the appropriate level of care (including to another hospital) as needed to meet the needs of the patient. The hospital must also provide annual training to relevant staff regarding the hospital policies and procedures for transferring patients under its care.

(d) *Standard: Requirements related to post-acute care services.* For those patients discharged home and referred for HHA services, or for those patients transferred to a SNF for post-hospital extended care services, or transferred to an IRF or LTCH for specialized hospital services, the following requirements apply, in addition to those set out at paragraphs (a) and (b) of this section:

(1) The hospital must include in the discharge plan a list of HHAs, SNFs, IRFs, or LTCHs that are available to the patient, that are participating in the Medicare program, and that serve the geographic area (as defined by the HHA) in which the patient resides, or in the case of a SNF, IRF, or LTCH, in the geographic area requested by the patient. HHAs must request to be listed by the hospital as available.

(i) This list must only be presented to patients for whom home health care post-hospital extended care services, SNF, IRF, or LTCH services are indicated and appropriate as determined by the discharge planning evaluation.

(ii) For patients enrolled in managed care organizations, the hospital must make the patient aware of the need to verify with their managed care organization which practitioners, providers or certified suppliers are in the managed care organization's network. If the hospital has information on which practitioners, providers or certified supplies are in the network of the patient's managed care organization, it must share this with the patient or the patient's representative.

(iii) The hospital must document in the patient's medical record that the list was presented to the patient or to the patient's representative.

(2) The hospital, as part of the discharge planning process, must inform the patient or the patient's representative of their freedom to choose among participating Medicare providers and suppliers of post-discharge services and must, when possible, respect the patient's or the patient's

representative's goals of care and treatment preferences, as well as other preferences they express. The hospital must not specify or otherwise limit the qualified providers or suppliers that are available to the patient.

(3) The discharge plan must identify any HHA or SNF to which the patient is referred in which the hospital has a disclosable financial interest, as specified by the Secretary, and any HHA or SNF that has a disclosable financial interest in a hospital under Medicare. Financial interests that are disclosable under Medicare are determined in accordance with the provisions of part 420, subpart C, of this chapter.

*[84 FR 51882, Sept. 30, 2019, as amended at 89 FR 94592, Nov. 27, 2024]*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)** _25-7438_____

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** /s/*Rhonda Lunsford, Esq.*      **Date** December 23, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number:** 25-7438

I am the attorney or self-represented party.

**This brief contains** _11,284_____ **words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/Rhonda Lunsford, Esq.*      **Date:** December 23, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 15. Certificate of Service for Electronic Filing**

**9th Cir. Case Number:** 25-7438

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[   ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[ X ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Hyunji Ahn: Hyunji.Ahn@blueshieldca.com (Electronic Service)

**Description of Document(s)** *(required for all documents)***:**

Appellant's Opening Brief (Preliminary Injunction Appeal)

**Signature** */s/Rhonda Lunsford*          **Date** December 23, 2025

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                                                    *Rev. 12/01/18*